499 S.E.2d 592

**Mary COLEMAN, J. Wesley Coleman, and Michelle Coleman, Plaintiffs Below, Appellees,**

v.

**Irvin SOPHER, Defendant Below, Appellant.**

No. 23943.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 17, 1997.

Decided Nov. 20, 1997.

Dissenting Opinion of Justice Maynard Nov. 21, 1997.

Concurring Opinion of Justice McHugh Dec. 18, 1997.

Charles F. Johns, Amy M. Smith, Steptoe & Johnson, Clarksburg, for the Appellant.

Joseph C. Cometti, Charleston, for the Appellees.

DAVIS, Justice:

Dr. Irvin Sopher, Chief Medical Examiner for the State of West Virginia, appeals a judgment entered against him by the Circuit Court of Fayette County in a tort action initiated by the relatives of a decedent upon whom Sopher performed an autopsy. The suit alleged that Sopher intentionally and without authorization removed the heart of the decedent. Sopher argues that the circuit court erred in finding that he was not entitled to qualified immunity with respect to the claims against him, in admitting certain evidence that Sopher now claims was prejudicial, and in instructing the jury that it could award punitive damages. Sopher also claims that a successor judge presiding over a portion of the proceedings erred in reconsider-

ing earlier rulings made by the original trial judge. We find no error. Therefore, we affirm the final order of the circuit court.

## I.

## FACTUAL AND PROCEDURAL HISTORY

Elmer Coleman, a thirty-nine year old coal miner, died suddenly from a heart attack on September 26, 1987. In order to determine whether occupational pneumoconiosis contributed to Elmer's death, his wife, Mary Coleman, executed a "CONSENT TO AUTOPSY," authorizing the "hospital or its agents and representatives, to do all procedures necessary or proper, including the removal of organs and parts of said body for microscopic or other examination and analysis."[1] The autopsy was performed on September 27, 1987, by Dr. Irvin Sopher, Chief Medical Examiner for the State of West Virginia [hereinafter Sopher]. Sopher's subsequent report, titled "POST–MORTEM EXAMINATION FINDINGS," failed to indicate whether pneumoconiosis had contributed to Elmer's death. However, relevant to the issues at hand, the report included the statement "[t]he heart is not removed from the body...." Following the autopsy, Elmer's body was released to Combs–Pennington Funeral Home where it was embalmed by Paul Pennington, the owner of the funeral home. After a funeral, Elmer's body was laid to rest in a mausoleum.

Sometime later, Mary Coleman filed a Workers' Compensation claim for occupational pneumoconiosis [hereinafter OP] survivor's benefits. Her claim was denied because Sopher's autopsy report did not indicate that Elmer Coleman suffered from OP. Consequently, Mary permitted Elmer's body to be exhumed and executed a second "CONSENT TO AUTOPSY" authorizing Dr. Echols Hansbarger to perform an autopsy to determine whether Elmer suffered from pneumoconiosis and, if so, whether it contributed to his death. Dr. Hansbarger's subsequent report noted

---

1. Mary Coleman desired this information to determine whether she and her children were enti- tled to Workers' Compensation survivor benefits.

that "the heart [was] not identified or found." When Mary Coleman discovered that her husband's heart had been removed from his deceased body, she became emotionally upset. Her children, J. Wesley and Michelle, became similarly distressed upon learning this information. Thereafter, Mary, J. Wesley and Michelle Coleman [hereinafter collectively referred to as the Colemans], filed suit in the Circuit Court of Fayette County against Sopher and Paul Pennington. The suit alleged intentional infliction of emotional distress, conversion and outrageous conduct.

By order entered November 7, 1991, the circuit court related that it earlier had announced that it "intended to grant summary judgment, sua sponte, on the grounds that the Plaintiff cannot legally maintain [an] action against two Defendants alleging that one or the other Defendant, but not both, are liable to the Plaintiff." The Colemans then moved to amend their complaint to elect one of the two defendants against whom they wished to proceed. The circuit court granted the motion. On April 13, 1992, the Colemans filed their amended complaint, which alleged the same causes of action as their original complaint, but listed Sopher as the sole defendant. In his answer to the Colemans' amended complaint, Sopher denied removing Elmer Coleman's heart and named Paul Pennington [hereinafter Pennington] as a third-party defendant.

The Honorable Judge W. Robert Abbot presided over the subsequent jury trial. At the conclusion of the evidence, Judge Abbot granted a directed verdict in favor of Pennington. On October 7, 1992, the jury returned a verdict against Sopher awarding compensatory damages of $75,000 to Mary Coleman and $30,000 each to J. Wesley and Michelle, and punitive damages of $50,000. Sopher then filed motions for judgment notwithstanding the verdict and for a new trial or remittitur. On April 21, 1994, Judge Abbot entered an order granting remittitur. He reduced the compensatory damage award to $50,000 for Mary Coleman and $10,000 for each child. The punitive damage award was not changed. The order also stated:

The Court, having granted a remittitur of the jury's verdict as stated herein, then did inquire of the plaintiffs whether they elected to have a new trial on the issue of damages or accept the remittitur. In response, counsel for the plaintiffs informed the court that the plaintiffs would not accept the remittitur and opted instead for a new trial.

The Colemans appealed the April 21, 1994, order to this Court. We initially granted the petition for appeal. However, following oral argument, in an opinion delivered by Justice Cleckley, the case was dismissed as improvidently granted. *See Coleman v. Sopher*, 194 W.Va. 90, 459 S.E.2d 367 (1995).

Thereafter, the matter was set for a new trial on damages in the circuit court. Because Judge Abbot had retired and subsequently died, the case was assigned to the Honorable Judge John W. Hatcher. After reviewing the case record, Judge Hatcher, *sua sponte*, asked the parties to argue whether he should reconsider Judge Abbot's rulings on Sopher's post-trial motions. Following arguments, Judge Hatcher, by order entered May 2, 1996, denied all of Sopher's post-trial motions. In the text of the order, Judge Hatcher discussed the trial court's delay of approximately one and one-half years in ruling on the defendant's post trial motions, the absence of a complete record of the court's hearing on those motions, and the lack of findings of fact and conclusions of law in the court's order. Judge Hatcher commented:

The Court, in consideration of Rule 63 of the West Virginia Rules of Civil Procedure, West Virginia case law and the Court's duty and inherent power to insure the effective and expeditious administration of the business of the Court, is of the opinion that because the Court failed to make any findings of fact and conclusions of law in regard to its rulings as to the aforementioned post-trial motions, the Court should now reconsider, on its own motion, the Court's rulings in regard to said post-trial motions, and make findings of fact and conclusions of law in regard thereto. The Court now can, by reading the trial transcripts of this case, just as

easily and competently consider and rule on the Defendant's post-trial motions, as could the original trial court nearly one and one-half years after the conclusion of the trial. The Court's present action is not to be taken as any criticism whatsoever of the original trial judge.

It is from this order that Sopher now appeals.

## II.

## DISCUSSION

### A. Qualified Immunity

■■■■ We first address Sopher's contention that the circuit court erred in rejecting his defense of immunity. Sopher raised the immunity issue in his motion for summary judgment, and again when he moved for a directed verdict. Unfortunately, in framing this issue for appeal to this Court, Sopher has failed to identify the particular stage of trial at which the court allegedly erred. To avoid an unnecessarily lengthy discussion addressing the possible points at which this error might have occurred, for purposes of our discussion, we will treat Sopher's argument as one complaining that the trial court erred in denying his motion for summary judgment on the grounds of qualified immunity.[2] This error presents a question of law which we will review *de novo. See* Syl. pt. 1, *Chrystal R.M. v. Charlie A.L.,* 194 W.Va. 138, 459 S.E.2d 415 (1995) ("Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review."). *See also* Syl. pt. 1, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994) ("A circuit court's entry of summary judgment is reviewed *de novo*.").[3] Moreover, we note that:

> " 'A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law.' Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York,* 148 W.Va. 160, 133 S.E.2d 770 (1963)." Syllabus Point 1, *Andrick v. Town of Buckhannon,* 187 W.Va. 706, 421 S.E.2d 247 (1992).

Syl. pt. 1, *Williams v. Precision Coil, Inc.,* 194 W.Va. 52, 459 S.E.2d 329 (1995).

2. While the circuit court rejected Sopher's claim of immunity for purposes of summary judgment and directed verdict, the question of Sopher's immunity was presented, as a question of fact, to the jury. Sopher does not argue before this Court that the jury instructions related to immunity were erroneous or that the evidence was insufficient to support the jury verdict on liability. Consequently, we limit our discussion to the issue we perceive Sopher to have raised, that is, whether, as a matter of law, Sopher was entitled to qualified immunity for the conduct alleged by the Colemans. *See* Syl. pt. 1, *Hutchison v. City of Huntington,* 198 W.Va. 139, 479 S.E.2d 649 (1996) ("The ultimate determination of whether qualified or statutory immunity bars a civil action is one of law for the court to determine. Therefore, unless there is a bona fide dispute as to the foundational or historical facts that underlie the immunity determination, the ultimate questions of statutory or qualified immunity are ripe for summary disposition.").

3. Regarding appeal of the denial of a motion for summary judgment, we have held:

> "An order denying a motion for summary judgment is merely interlocutory, leaves the case pending for trial, and is not appealable except in special instances in which an interlocutory order is appealable." Syllabus Point 8, *Aetna Casualty and Surety Co. v. Federal Insurance Company of New York,* 148 W.Va. 160, 133 S.E.2d 770 (1963).

Syl. pt. 1, *Gooch v. West Virginia Dep't of Public Safety,* 195 W.Va. 357, 465 S.E.2d 628 (1995). However, this holding does not preclude appeal of a denial of summary judgment after the conclusion of a trial and the entry of a final order. We have previously commented:

> If unsuccessful at trial, the movant may still raise the denial of his [W. Va. R. Civ. P. 12(c) or 56] motion as error on an appeal subsequent to the entry of a final order. See, *Aetna Casualty & Surety Company v. Federal Insurance Company of New York,* [148 W.Va. 160, 133 S.E.2d 770 (1963)]; *Sinclair Refining Company v. Stevens,* 123 F.2d 186 (8th Cir. 1941), *cert. den.,* 315 U.S. 804, 62 S.Ct. 632, 86 L.Ed. 1203 (1942).

*Wilfong v. Wilfong,* 156 W.Va. 754, 759, 197 S.E.2d 96, 100 (1973). *See also Adkins v. Chevron, USA, Inc.,* 199 W.Va. 518, 522, 485 S.E.2d 687, 691 (1997) (*per curiam*) ("We review *de novo* both the denial of the motion for summary judgment and the denial of the directed verdict."); *City Nat'l Bank of Charleston v. Wells,* 181 W.Va. 763, 768, 384 S.E.2d 374, 379 (1989) (addressing on appeal, without stating standard of review, appellant's claim that trial court erred in denying motion for summary judgment).

Having set forth the appropriate standard for reviewing this issue, we turn now to the merits of Sopher's claimed error. Sopher argues that, as an appointee of the director of the Department of Health whose salary is paid by public funds, he is a public official entitled to qualified immunity pursuant to this Court's holding in *Clark v. Dunn,* 195 W.Va. 272, 465 S.E.2d 374 (1995). Sopher asserts that he is shielded by immunity as he was acting within the scope of his authority, under W. Va.Code § 61–12–10,[4] to retain tissue for further study or consideration, and, further, because he did not violate any clearly established right of the Colemans'. In addition, Sopher submits that he is entitled to immunity under W. Va.Code § 16–4B–1.[5]

The Colemans respond by asserting that Sopher is not entitled to qualified immunity because his actions exceeded the scope of his authority. Moreover, the Colemans note that a public official is entitled to qualified immunity for *negligence,* whereas they have alleged the commission of *intentional* torts. Additionally, the Colemans argue that Sopher cannot claim immunity under W. Va. Code § 61–12–10 unless he admits to taking the heart and identifies the purpose for the

taking. Moreover, they assert that § 61–12–10 has no application to Elmer Coleman's autopsy as it was authorized by his wife. Finally, the Colemans argue that the purpose of the autopsy performed on Elmer Coleman was limited to a determination of the cause of Elmer's death and, thus, the language of § 16–4B–1, permitting an autopsy to be performed "in the interest of medical science," should be similarly limited in this instance to an inquiry into the cause of death.

 We find that the circuit court correctly determined that Sopher was not entitled to qualified immunity, as a matter of law, with respect to the claims asserted against him in this action.[6] We recently restated the standard for determining qualified immunity in syllabus point 3 of *Clark v. Dunn,* 195 W.Va. 272, 465 S.E.2d 374 (1995), the case upon which Sopher relies:

> "A public executive official who is acting *within the scope of his authority* and is not covered by the provisions of W. Va.Code, 29–12A–1, *et seq.* [the West Virginia Governmental Tort Claims and Insurance Reform Act],[7] *is entitled to qualified immunity* from personal liability *for official acts if the involved conduct did not violate*

4. W. Va.Code § 61–12–10 (1988) (Repl.Vol.1997) states in relevant part:

> If in the opinion of the chief medical examiner, or of the medical examiner of the county in which the death in question occurred, it is advisable and in the public interest that an autopsy be made, or if an autopsy be requested by either the prosecuting attorney or the judge of the circuit court or other court of record having criminal jurisdiction in such county, such autopsy shall be made by the chief medical examiner, by a member of his staff, or by such competent pathologist as the chief medical examiner shall designate and employ pursuant to the provisions of this article.... A full record and report of the findings developed by the autopsy shall be filed with the office of medical examinations by such person making the autopsy.

> . . . Any person performing an autopsy pursuant to the authority of this section shall be empowered to keep and retain, for and on behalf of the chief medical examiner, any tissue from the body upon which the autopsy was performed which may be necessary for further study or consideration.

5. W. Va.Code § 16–4B–1 (1972) (Repl.Vol.1995) states in relevant part:

> In case of the death of any person in the State of West Virginia, the attending physician, or if there be none, any physician, if he deems it advisable in the interest of medical science, may perform or cause to be performed an autopsy on the body of such deceased person without liability therefor, provided consent to such autopsy is first obtained....

6. Whether Sopher was entitled to immunity given the particular facts of this case was a question that was properly determined by the jury.

7. The West Virginia Governmental Tort Claims and Insurance Reform Act applies to political subdivisions. The office of medical examinations, operated under the control and supervision of the director of the Department of Health, is a state agency and not a political subdivision. Thus, the Chief Medical Examiner, as an employee of the state, rather than an employee of a political subdivision, is a public executive official to whom the Governmental Tort Claims and Insurance Reform Act does not apply. *See* W. Va.Code § 29–12A–3(c) (1986) (Repl.Vol.1992) (defining "political subdivision"); W. Va.Code § 29–12A–3(e) (defining "State"); and W. Va. Code 61–12–3 (1977) (Repl.Vol.1997) (establishing office of medical examinations).

*clearly established laws of which a reasonable official would have known.* There is no immunity for an executive official whose acts are fraudulent, malicious, or otherwise oppressive. To the extent that *State ex rel. Boone National Bank of Madison v. Manns,* 126 W.Va. 643, 29 S.E.2d 621 (1944), is contrary, it is overruled." Syllabus, *State v. Chase Securities, Inc.,* 188 W.Va. 356, 424 S.E.2d 591 (1992).

(Emphasis added) (footnote added).[8] The first portion of this test presents the threshold question of whether a public official was acting within the scope of his or her authority. If this inquiry is answered affirmatively, and the official is not covered by the West Virginia Governmental Tort Claims and Insurance Reform Act, the inquiry proceeds to a determination of whether the official violated "clearly established laws of which a reasonable official would have known." *Id.* Finally, this standard concludes by recognizing

that "[t]here is no immunity for an executive official whose acts are fraudulent, malicious, or otherwise oppressive." *Id.* We find that Sopher's immunity fails under the threshold portion of this test.

■ Sopher argues first that he was acting within his authority under W. Va.Code § 61–12–10.[9] We disagree. W. Va.Code § 61–12–10 (1988) (Repl.Vol.1997) provides that an autopsy may be performed "[i]f in the opinion of the chief medical examiner, or of the medical examiner of the county in which the death in question occurred, it is advisable and in the public interest." From this text, it is not clear how the chief medical examiner would come to know of a particular death in order to form an opinion as to whether an autopsy would be "advisable and in the public interest." However, this section must be read *in pari materia* with W. Va.Code § 61–12–8 (1963) (Repl.Vol.1997).[10] Viewing these

**8.** Syllabus point 3 of *Clark v. Dunn,* 195 W.Va. 272, 465 S.E.2d 374 (1995), restated a principle first set forth by this Court in the sole syllabus point of *State v. Chase Securities, Inc.,* 188 W.Va. 356, 424 S.E.2d 591 (1992). *State v. Chase* was decided shortly after the trial of this case. The Colemans do not contest the applicability of the *Chase* standard in this instance, and, in fact, have applied it in an effort to show that Sopher is not entitled to the immunity he claims. However, because the *Chase* holding did not exist at the time of Sopher's acts, we deem it necessary to consider its applicability to this case. The test for determining whether to extend retroactivity is stated in syllabus point 5 of *Bradley v. Appalachian Power Co.*:

In determining whether to extend full retroactivity, the following factors are to be considered: First, the nature of the substantive issue overruled must be determined. If the issue involves a traditionally settled area of law, such as contracts or property as distinguished from torts, and the new rule was not clearly foreshadowed, then retroactivity is less justified. Second, where the overruled decision deals with procedural law rather than substantive, retroactivity ordinarily will be more readily accorded. Third, common law decisions, when overruled, may result in the overruling decision being given retroactive effect, since the substantive issue usually has a narrower impact and is likely to involve fewer parties. Fourth, where, on the other hand, substantial public issues are involved, arising from statutory or constitutional interpretations that represent a clear departure from prior precedent, prospective application will ordinarily be favored. Fifth, the more radically the new deci-

sion departs from previous substantive law, the greater the need for limiting retroactivity. Finally, this Court will also look to the precedent of other courts which have determined the retroactive/prospective question in the same area of the law in their overruling decisions. 163 W.Va. 332, 256 S.E.2d 879 (1979). We have considered the *Bradley* criteria and find that our holding in *Chase* may properly be applied to the case *sub judice.* We decline to engage in a protracted discussion of this retroactivity issue as it was not raised by the parties. However, in reaching our conclusion, we found the following factors particularly compelling: (1) the fact that there is scant West Virginia law regarding public official immunity; (2) *Chase* did not substantially change existing law, and simplified the law in some respects; and (3) the qualified immunity addressed in *Chase* is a creature of common law.

**9.** *See supra* note 4 for the text of W. Va.Code § 61–12–10.

**10.** The relevant portions of W. Va.Code § 61–12–8 (1963) (Repl.Vol.1997) state:

When any person shall die in this State from violence, or by apparent suicide, or suddenly when in apparent good health, or when unattended by a physician, or when an inmate of a public institution not hospitalized therein for organic disease, or from some disease which might constitute a threat to public health, or in any suspicious, unusual or unnatural manner, the medical examiner of the county in which such death occurs shall be immediately notified by the physician in attendance, by any law-enforcement officer having knowledge of

two sections together, it becomes apparent that suspicious deaths must be reported to the medical examiner for a determination of whether further investigation is necessary to ascertain whether criminal activity might be implicated with respect to a particular death. These sections also provide for the medical examiner to preserve evidence that might be needed in a future criminal trial. While Elmer Coleman's sudden death may very well have triggered the application of these sections, there was no evidence presented during the trial of this case to indicate that the provisions therein contained were followed. In the absence of such evidence, Sopher may not rely on those sections to provide authority for his actions.

■ Evidence implicating the provisions of W. Va.Code § 16–4B–1 (1972) (Repl.Vol. 1995),[11] Sopher's second claimed source of authority, was similarly absent from trial. There was no testimony establishing that an attending or other physician considered it "advisable in the interest of medical science" that an autopsy be performed on Elmer Coleman's body.

■ The only evidence in the record establishing Sopher's authority to perform an autopsy on Elmer Coleman's body was the "CONSENT TO AUTOPSY" executed by Mary Coleman. The consent read as follows:

I, (we), standing in the relationship of Elmer Coleman, [sic] and being the next of kin, do hereby *request and authorize the performance of a post-mortem examination upon the body of Elmer Coleman,* now deceased; said examination to be performed by, or under the direction of any member of the Staff or other authorized agent of Montgomery General Hospital. I, (we), do further authorize said hospital or its agents and representatives, *to do all procedures necessary or proper, including the removal of organs and parts of said*

*body for microscopic or other examination and analysis.*

I, (we), in consideration of such requests and performance of such post-mortem examination, do hereby forever release and discharge the Montgomery General Hospital, and the medical staff, agents or representatives of it, or either of them, from any and all liability of any nature whatsoever for their joint or several acts *performed in pursuance of this request or consent.*

(Emphasis added).

■ To determine whether Sopher acted within his authority under this agreement, which would entitle him to immunity provided that the other elements of the *Chase* test are met, we must discern the nature and scope of his authority from the terms of the agreement, if possible. In carrying out this analysis, we must strive to give effect to the intent of the parties to the agreement. With respect to the construction or application of a contract, we have held, generally:

"A valid written instrument which expresses the intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent." *Cotiga Development Co. v. United Fuel Gas Co.,* 147 W.Va. 484, 128 S.E.2d 626 (1962), Syllabus Point 1.

Syl. pt. 1, *Bennett v. Dove,* 166 W.Va. 772, 277 S.E.2d 617 (1981). Elaborating on this general principle, we have explained:

" 'It is not the right or province of a court to alter, pervert or destroy the clear meaning and intent of the parties as expressed in unambiguous language in their written contract or to make a new or different contract for them.' *Cotiga Development Co. v. United Fuel Gas Co.,* 147 W.Va. 484, 128 S.E.2d 626 (1962), Syllabus Point 3." Syllabus Point 2, *Bennett v. Dove,* 166 W.Va. 772, 277 S.E.2d 617 (1981).

such death, or by the funeral director, or by any other person present.... Upon receipt of such notice, the medical examiner shall take charge of the dead body, make inquiries regarding the cause and manner of death, reduce his findings to writing, and promptly make a full report thereof to the chief medical examiner on forms prescribed for such purpose, retaining one copy of such report for his own

office records, and that of the chief medical examiner and should deliver another copy thereof to the prosecuting attorney of such county, and to any attorney of record in any criminal proceedings or civil action wherein the cause of death is an issue.

11. *See supra* note 5 for the text of W. Va.Code § 16–4B–1.

Syl. pt. 1, *Fraternal Order of Police, Lodge No. 69 v. City of Fairmont*, 196 W.Va. 97, 468 S.E.2d 712 (1996). However, when a contract is ambiguous, it is subject to construction. We have explained:

> The term "ambiguity" is defined as language "reasonably susceptible of two different meanings" or language "of such doubtful meaning that reasonable minds might be uncertain or disagree as to its meaning[.]" Syl. pt. 1, in part, *Shamblin v. Nationwide Mut. Ins. Co.*, 175 W.Va. 337, 332 S.E.2d 639 (1985).

*Payne v. Weston*, 195 W.Va. 502, 507, 466 S.E.2d 161, 166 (1995). *See also Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 65 n. 23, 459 S.E.2d 329, 342 n. 23 (1995) ("A contract is ambiguous when it is reasonably susceptible to more than one meaning in light of the surrounding circumstances and after applying the established rules of construction.").

With due consideration for the above stated principles, we find the "CONSENT TO AUTOPSY" agreement between Mary Coleman and Montgomery General Hospital is ambiguous. The first paragraph requests and authorizes "a post-mortem examination" without identifying the agreed upon purpose for the examination. Thus, we do not know if the examination was intended: for research purposes to further medical science; to determine the general cause of death; to determine whether a particular condition existed; to determine whether a particular condition, if it existed, contributed in any way to the death of the subject of the examination; or for any other purpose we have not herein contemplated. In other words, the scope of the authorization is not indicated. The second paragraph then authorizes the "hospital or its agents ... to do all procedures necessary or proper," apparently, though not specifically stated, in furtherance of the post-

mortem examination. This language is additionally ambiguous in that, without an identified scope for the post-mortem examination, the phrase "necessary or proper" is meaningless. A particular act may be "necessary or proper" for one purpose, yet be unnecessary or improper for another. Finally, the third paragraph states that Montgomery General Hospital and its agents are released from liability for acts "performed in pursuance of this request or consent." It is impossible to verify whether a particular act was "in pursuance" of a "request or consent," when the thing requested or consented to is unknown. Because the contract does not indicate the specific purpose or scope of the post-mortem examination, the extent of the release from liability for acts "performed in pursuance of [the] request or consent" is not clearly articulated.

▮ Having found the "CONSENT TO AUTOPSY" is ambiguous, we must endeavor to construe it to enforce the intent of the parties and to give meaning to the entire contract. *See* Syl. pt. 2, *Columbia Gas Transmission Corp. v. E.I. du Pont de Nemours & Co.*, 159 W.Va. 1, 217 S.E.2d 919 (1975) ("In construing an ambiguous contract, three well-recognized rules of construction require: (1) that the intentions of the parties to the agreement must control the obligations thereunder; (2) that in searching for the intentions of contracting parties, the court must examine the instrument in its entirety; and (3) that words are to be considered in the context in which they are employed.").[12] To determine the parties' intention when construing an ambiguous contract, we may resort to extrinsic or parol evidence:

> "[']"Extrinsic evidence may be used to aid in the construction of a contract if the matter in controversy is not clearly expressed in the contract, and in such case

---

**12.** *See also Fraternal Order of Police, Lodge No. 69 v. City of Fairmont*, 196 W.Va. 97, 101 n. 7, 468 S.E.2d 712, 716 n. 7 (1996) ("If an inquiring court concludes that an ambiguity exists in a contract, the ultimate resolution of it typically will turn on the parties' intent. Exploring the intent of the contracting parties often, but not always, involves marshaling facts extrinsic to the language of the contract document. When this need arises, these facts together with reasonable inferences extractable therefrom are superim-

posed on the ambiguous words to reveal the parties' discerned intent."); Syllabus, *Henderson Dev. Co. v. United Fuel Gas Co.*, 121 W.Va. 284, 3 S.E.2d 217 (1939) ("The primary consideration in the construction of a contract is the intention of the parties. This intention must be gathered from an examination of the whole instrument, which should be so construed, if possible, as to give meaning to every word, phrase and clause and also render all its provisions consistent and harmonious.").

the intention of the parties is always important and the court may consider parol evidence in connection therewith with regard to conditions and objects relative to the matter involved...." Syl. Pt. 2, *Berkeley Co. Pub. Ser. Dist. v. Vitro Corp.,* 152 W.Va. [252], [162 S.E.2d 189 (1968) ].['] Syllabus Point 2, *International Nickel Co. v. Commonwealth Gas Corp.,* 152 W.Va. 296, 163 S.E.2d 677 (1968)." Syllabus Point 2, *Bittorf v. Bittorf,* 182 W.Va. 594, 390 S.E.2d 793 (1989).

Syl. pt. 2, *Martin v. Martin,* 187 W.Va. 372, 419 S.E.2d 440 (1991) *(per curiam ).*

After thoroughly reviewing the record in this case, we found the only source of evidence indicating the parties' intent with respect to the "CONSENT TO AUTOPSY" was Mary Coleman's testimony.[13] Mary's testimony indicated that, shortly after she was informed of Elmer's death, hospital personnel asked her, without elaboration, if she wanted an autopsy performed on her husband. After consulting with her father-in-law, Mary decided to request the autopsy in order to determine whether Elmer suffered from OP as a result of his years of working in coal mines.[14] Based upon this uncontroverted evidence, we conclude that the intended purpose for the post-mortem examination was to determine whether Elmer Coleman suffered from OP.[15] For purposes of immunity, the question then becomes whether the removal of Elmer's heart was within Sopher's authority pursuant to a "CONSENT TO AUTOPSY" agreement entered into for the purpose of determining whether Elmer Coleman suffered from OP. We find that removal of the heart exceeded this authority.

**13.** Because Sopher failed to articulate the specific stage of trial at which this error occurred, this Court is at liberty to consider any evidence contained in the record. The evidence upon which we base our decision, which was adduced through Mary Coleman's trial testimony, could have been inferred by the trial court from the record as it existed at the time the court ruled on Sopher's motion for summary judgement. We choose to utilize Mary Coleman's trial testimony because it more clearly articulates the evidence and simplifies our discussion.

**14.** If Elmer suffered from occupational pneumoconiosis and it contributed to his death, Mary and her children may have been eligible for Workers' Compensation survivor's benefits.

Common sense dictates that a medical examiner performing a post-mortem examination for the benefit of another is required to keep records of the examination and to generate some type of report of the findings of the exam. *Cf.* W. Va.Code § 61–12–10 (1988) (Repl Vol.1997) (providing that the office of medical examinations keep "full, complete, and properly indexed records of all deaths investigated," and that "[c]opies of such records" be "furnished, upon request, to any party to whom the cause of death is a material issue"). Commensurate with this responsibility is the duty to produce accurate and reliable records and reports. Sopher's "POST–MORTEM EXAMINATION FINDINGS," indicated that "the heart [was] not removed." During his testimony, Sopher attested to the reliability and accuracy of this report. The comment in the report that the heart was not removed can be reasonably interpreted to mean that removal of the heart was not "necessary or proper," in furtherance of the examination, and, thus, was not authorized by the "CONSENT TO AUTOPSY."[16] Consequently, Sopher, as an agent of Montgomery General Hospital, is not released from liability for removing the heart under the terms of the agreement since removal of the heart was not an act "performed in pursuance of [the] request or consent," as evidenced by Sopher's own report. Since Sopher did not have authority to remove Elmer Coleman's heart, he is not entitled to qualified immunity from a suit alleging damages incurred from such removal. Therefore, the circuit court correctly denied Sopher's motion for summary judgment asserting qualified immunity.

**15.** Determination of the intent of parties to a contract typically creates a question of fact to be determined by a jury. However, because the evidence upon which we rely is uncontroverted, there is no question of fact.

**16.** If Sopher's report had indicated that removal of the heart was a procedure that was "necessary or proper" in furtherance of the post-mortem examination conducted to determine whether Elmer Coleman suffered from OP, he would have been acting within his authority under the "CONSENT TO AUTOPSY" to remove "organs and parts of said body for microscopic or other examination and analysis."

Having determined that Sopher is not entitled to immunity for the removal of Elmer Coleman's heart, because the removal was outside the scope of his authority, we need not proceed to an analysis of the remaining elements of the *Chase* test for determining qualified immunity. However, Sopher has raised the question of whether there is a clearly recognized property interest in the internal organs of a deceased body. This issue relates to the element of the *Chase* test requiring that, to be eligible for immunity, a public official must not violate a "clearly established law[ ] of which a reasonable official would have known." In response to Sopher's inquiry, we briefly will address this issue.

In *Whitehair v. Highland Memory Gardens, Inc.*, 174 W.Va. 458, 460–61, 327 S.E.2d 438, 440–41 (1985), we observed that "[i]n this country, where we have no ecclesiastical courts, the law has long recognized a 'quasi-property' right in the survivors to control the disposition of a loved one's remains." [17] We further observed:

> The quasi-property rights of the survivors include the right to custody of the body; to receive it in the condition in which it was left, without mutilation; to have the body treated with decent respect, without outrage or indignity thereto; and to bury or otherwise dispose of the body without interference.

*Id.* at 461, 327 S.E.2d at 441 (citations omitted).

We note that the facts in a case such as the one presently before us implicate at least two of the above-described quasi-property rights in a loved one's remains. Nevertheless, because we have determined that Sopher's actions exceeded the scope of his legitimate authority, we decline to address further a relative's property interest in the internal organs of his/her decedent.

### B. Prejudicial Testimony

Sopher next argues that the circuit court abused its discretion by admitting, over his objection, testimony that he had previously donated brain tissue obtained during autopsies to Marshall University Medical School without providing notice to the decedents' family members. Sopher contends that this evidence should have been excluded under West Virginia Rule of Evidence 404(b), which also implicates Rules 401, 402 and 403. Specifically, Sopher complains that the evidence "only tended to prove Dr. Sopher's character and his propensity to act in conformity therewith." In addition, he challenges the trial court's failure to perform the balancing test required by *State v. McGinnis*, 193 W.Va. 147, 455 S.E.2d 516 (1994), and Rule 403 to determine whether the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. Before addressing the merits of Sopher's contentions, we must determine whether these issues are properly before us.

At a pre-trial conference, counsel for Sopher moved *in limine* for the exclusion of evidence regarding the donation of brain tissue. However, the record contains no written motion for the exclusion of this evidence. In addition, the transcript of the pre-trial hearing wherein Sopher's oral motion was discussed fails to reveal his specific complaint regarding this evidence.[18] After a brief discussion regarding the nature of the evidence, the trial court ruled that it would be admitted. The record indicates that the court admitted this testimony based upon the representations of counsel for the Colemans. Counsel represented that the challenged evidence was connected to the allegations in this case in that both occurred at about the same time, and both involved the removal of bodily tissue. Thereafter, during trial, the Colemans called Sopher as a witness and questioned him regarding his past donations of brain tissue. In the course of this testimony, Sopher's counsel made two objections pertaining to the form of the particular question being asked and one additional objection as

---

17. For a detailed discussion of the history and development of this quasi-property interest, see Louis J. Palmer, Jr., *Capital Punishment: A Utilitarian Proposal for Recycling Transplantable Organs as Part of a Capital Felon's Death Sentence*, 29 U. West L.A. L.Rev. 201 (1998).

18. Apparently, the motion was made at a time when the proceedings were not being recorded.

to relevancy. Because Sopher failed to raise, on the record, the specific errors he now asserts, we deem any such errors were waived.

■ Timely and specific objections are required under Rule 103(a) [19] of the West Virginia Rules of Evidence, and Rule 46 of the West Virginia Rules of Civil Procedure.[20] In addition, we have repeatedly held that "[w]here objections were not shown to have been made in the trial court, and the matters concerned were not jurisdictional in character, such objections will not be considered on appeal." Syl. pt. 1, *State Road Comm'n v. Ferguson*, 148 W.Va. 742, 137 S.E.2d 206 (1964). *See also* Syl. pt. 2, *Maples v. West Virginia Dep't of Commerce*, 197 W.Va. 318, 475 S.E.2d 410 (1996) (quoting Syl. pt. 1, *Ferguson* ). Elaborating on this principal, we have explained that an objection to evidence must be timely and specific in order to give the trial court an opportunity to address the issue at a time when corrective action may be taken. In *State v. LaRock*, we expounded:

> Our cases consistently have demonstrated that, in general, the law ministers to the vigilant, not to those who sleep on their rights. Recently, we stated in *State ex rel. Cooper v. Caperton*, 196 W.Va. 208, 216, 470 S.E.2d 162, 170 (1996): "The rule in West Virginia is that parties must speak clearly in the circuit court, on pain that, if they forget their lines, they will likely be bound forever to hold their peace." (Citation omitted). When a litigant deems himself or herself aggrieved by what he or she considers to be an important occurrence in the course of a trial or an erroneous ruling by a trial court, he or she ordinarily must object then and there or forfeit any right to complain at a later time. The pedigree

for this rule is of ancient vintage, and it is premised on the notion that calling an error to the trial court's attention affords an opportunity to correct the problem before irreparable harm occurs. There is also an equally salutary justification for the raise or waive rule: It prevents a party from making a tactical decision to refrain from objecting and, subsequently, should the case turn sour, assigning error (or even worse, planting an error and nurturing the seed as a guarantee against a bad result). In the end, the contemporaneous objection requirement serves an important purpose in promoting the balanced and orderly functioning of our adversarial system of justice.

196 W.Va. 294, 316, 470 S.E.2d 613, 635 (1996).

While the record indicates that Sopher presented a motion *in limine* for the exclusion of the evidence herein complained of, the record fails to establish that the specific challenges now raised were presented to or addressed by the court below. Thus, Sopher failed to preserve these alleged errors. *See Tennant v. Marion Health Care Found., Inc.*, 194 W.Va. 97, 114, 459 S.E.2d 374, 391 (1995) ("[T]he party complaining on appeal of the admission of evidence bears sole responsibility for adequately preserving the record for meaningful appellate review."). *See also* Syl. pt. 3, *Hudgins v. Crowder & Freeman, Inc.*, 156 W.Va. 111, 191 S.E.2d 443 (1972) ("Courts of record can speak only by their records, and what does not so appear does not exist in law."). Because these issues are not reflected in the record, we decline to consider them on appeal.

### C. Punitive Damages

Sopher also argues that the circuit court improperly instructed the jury, over his ob-

---

19. W. Va. R. Evid. 103(a) states:

> (a) ... Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
> (1) ... In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context[.]

20. W. Va. R. Civ. P. 46 states:

> Formal exceptions to rulings or orders of the court are unnecessary; but for all purposes for which an exception has heretofore been necessary it is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objection to the action of the court and his grounds therefor; and, if a party has no opportunity to object to a ruling or order at the time it is made, the absence of an objection does not thereafter prejudice him.

jection, that it could award punitive damages in this action. Sopher contends, as he did at trial, that the punitive damage instruction should not have been given to the jury as it was unsupported by the evidence. Before addressing Sopher's argument on the merits, we will consider the appropriate standard for reviewing a trial court's decision to grant or refuse a particular jury instruction based upon the sufficiency of the evidence presented at trial. In addressing this standard, we will necessarily discuss the degree of evidence required to support the giving of a particular instruction. However, we note at the outset that our discussion is limited to addressing the degree of evidence required to support *the giving of a particular instruction to the jury.* Sopher has not raised the separate issue of whether the evidence presented at trial was sufficient to support the *jury verdict* which ultimately resulted from the instruction.

Trial courts are afforded broad discretion in formulating jury instructions. *See* Syl. pt. 4, *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995) (holding, in part, "[a] trial court ... has broad discretion in formulating its charge to the jury, so long as the charge accurately reflects the law"). "Whether facts are sufficient to justify the delivery of a particular instruction is reviewed by this Court under an abuse of discretion standard." Syl. pt. 12, in part, *State v. Derr,* 192 W.Va. 165, 451 S.E.2d 731 (1994). *See also State v. Guthrie,* 194 W.Va. at 671 n. 12, 461 S.E.2d at 177 n. 12. Moreover, upon review " '[i]t will be presumed that a trial court acted correctly in giving or in refusing to give instructions to the jury, unless it appears from the record in the case that the instructions given were prejudicially erroneous or that the instructions refused were correct and should have been given.' Syllabus point 1, *State v. Turner,* 137 W.Va. 122, 70 S.E.2d 249 (1952)." Syl. pt. 5, *Maples v. West Virginia Dep't of Commerce,* 197

W.Va. 318, 475 S.E.2d 410 (1996). However, we have recognized that " ' "[a]n instruction should not be given when there is no evidence tending to prove the theory upon which the instruction is based." Syl. pt. 4, *Hovermale v. Berkeley Springs Moose Lodge No. 1483,* [165] W. Va. [689], 271 S.E.2d 335 (1980).' Syllabus point 3, *Jenrett v. Smith,* 173 W.Va. 325, 315 S.E.2d 583 (1983)." Syl. pt. 4, *Maples.*

To determine whether a trial court has abused its discretion in giving or refusing to give an instruction that has been challenged on sufficiency of the evidence grounds, we must consider the degree of evidence necessary to support the giving of a particular jury instruction. We have previously explained that:

> " ' "If there be evidence tending in some appreciable degree to support the theory of proposed instructions, it is not error to give such instructions to the jury, though the evidence be slight, or even insufficient to support a verdict based entirely on such theory." Syllabus Point 2, *Snedeker v. Rulong,* 69 W.Va. 223, 71 S.E. 180 (1911).' Syllabus Point 4, *Catlett v. MacQueen,* 180 W.Va. 6, 375 S.E.2d 184 (1988)." Syllabus point 6, *Wilt v. Buracker,* 191 W.Va. 39, 443 S.E.2d 196 (1993), *cert. denied,* 511 U.S. 1129, 114 S.Ct. 2137, 128 L.Ed.2d 867 (1994).

Syl. pt. 3, *Craighead v. Norfolk & Western Ry. Co.,* 197 W.Va. 271, 475 S.E.2d 363 (1996).[21]

Turning to the issue at hand, whether there was sufficient evidence presented to support an instruction on punitive damages, we note that this court has held:

> "Punitive or exemplary damages are such as, in a proper case, a jury may allow against the defendant by way of punishment for wilfulness, wantonness, malice, or other like aggravation of his wrong to the

---

**21.** Sopher urges that, in the context of punitive damages, there must be *clear cut and convincing evidence* to support a jury instruction. In support of this contention, Sopher cites *Michael v. Sabado,* 192 W.Va. 585, 601, 453 S.E.2d 419, 435 (1994). The portion of *Sabado* referred to by Sopher contains the Court's discussion of two cases cited by the appellant in that case. Justice

Cleckley observed that "the evidence presented was clear cut. The plaintiffs in these two cases were able to convincingly prove definite misrepresentations by the respective defendants." Justice Cleckley's observations about those two cases are dicta, and do not establish a new standard requiring clear and convincing evidence to support jury instructions on punitive damages.

plaintiff, over and above full compensation for all injuries directly or indirectly resulting from such wrong." Syllabus Point 1, *O'Brien v. Snodgrass,* 123 W.Va. 483, 16 S.E.2d 621 (1941).

Syl. pt. 4, *Harless v. First Nat'l Bank,* 169 W.Va. 673, 289 S.E.2d 692 (1982). We have also stated that "[p]unitive damage instructions are legitimate only where there is evidence that a defendant acted with wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others to appear or where the legislature so authorizes." Syl. pt. 7, *Michael v. Sabado,* 192 W.Va. 585, 453 S.E.2d 419 (1994). Sopher argues that the Colemans submitted no evidence that he willfully or wantonly caused the Colemans to be injured or that he acted with willful, reckless indifference and disregard of the Colemans' rights. Consequently, Sopher continues, the court erred in giving a punitive damages instruction. We disagree.

▬ The evidence in this case revealed that Sopher's report of the autopsy performed on Elmer Coleman specifically stated that "the heart [was] not removed." However, the evidence strongly suggested that the heart was in fact removed. Dr. Hansbarger was unable to identify or find the heart during his subsequent autopsy. In addition, Mary Coleman testified that Sopher admitted to her that he removed the heart,

and stated that he thought he gave it to Combs–Pennington to be returned to the body. This evidence creates a reasonable inference that Sopher removed the heart and then attempted to conceal the taking. Additionally, as we explained above, Sopher did not have the authority to remove the heart in this instance, as it was not necessary in furtherance of this particular autopsy. We believe the foregoing evidence was sufficient to support a jury instruction on punitive damages.[22] Therefore, we find that the circuit court did not abuse its discretion in giving a punitive damage instruction.

### D. Judge Hatcher's Reconsideration of Judge Abbot's Award of a New Trial on Damages

Finally, Sopher contends that Judge Hatcher erred in reconsidering Judge Abbot's rulings on Sopher's post-trial motions for a new trial or remittitur. Sopher argues that deference should be given to Judge Abbot's rulings because, as the trial judge, he was in a better position to weigh the evidence and assess the credibility of the witnesses.[23] Moreover, Sopher argues that he was entitled to a new trial on damages because the jury verdict was excessive. The Colemans respond that, because Judge Abbot's order granting a new trial on the issue of damages failed to provide any findings of fact or conclusions of law, it was not entitled to defer-

---

22. We also note that "punitive damages serve several purposes. Among the primary ones are: (1) to punish the defendant; (2) to deter others from pursuing a similar course; and, (3) to provide additional compensation for the egregious conduct to which the plaintiff has been subjected." *Harless v. First Nat. Bank in Fairmont,* 169 W.Va. 673, 691, 289 S.E.2d 692, 702 (1982). Furthermore, " '[Punitive damages] encourage a plaintiff to bring an action where he might be discouraged by the cost of the action or by the inconvenience of a criminal proceeding.... [They also] provide a substitute for personal revenge by the wronged party.' " *Id.* at 169 n. 17, 289 S.E.2d at 703 n. 17 (citations omitted).

23. Sopher also contends that Judge Hatcher should not have reconsidered Judge Abbot's ruling on remittitur because the Colemans' election to accept a new trial on damages should be binding. In support of this contention, Sopher relies on our holding in the previous appeal of this case. *See Coleman v. Sopher,* 194 W.Va. 90, 459 S.E.2d 367 (1995) [hereinafter *Coleman 1* ].

We find that Sopher's reliance on our decision in *Coleman 1* is misplaced. That decision addresses this Court's jurisdiction to review a lower court's award of a new trial. In Syllabus point 4 of *Coleman 1,* we held:

When a party agrees to or requests a new trial, and a new trial is granted because of the agreement or request, a *denial of appellate review is justified* on the ground that the party has elected to accept the new trial and should be bound, as if the party had entered a settlement agreement to forego appeal of the order granting a new trial.

(Emphasis added). Justice Cleckley commented in this regard: "Allowing the plaintiffs to appeal this narrow issue would serve no useful purpose. Even if the plaintiffs are successful, the victory would merely get that to which they are already entitled—a new trial—to which both parties have already agreed." *Id.* at 95, 459 S.E.2d at 372. *Coleman 1* did not address the issue now before us, which is whether a successor judge may revisit an earlier ruling of his or her predecessor.

ence. In addition, they assert that Judge Hatcher had authority to rescind Judge Abbot's decision. We find no error in Judge Hatcher's actions.

█ Rule 63 of the West Virginia Rules of Civil Procedure addresses the duties which may be performed by a successor judge when the original trial judge is unable to preside through the conclusion of a particular case, and states:

> If by reason of death, sickness, or other disability, a judge before whom an action has been tried is *unable to perform the duties to be performed by the court under these rules after a verdict is returned* ... then any successor ... judge sitting in the court in which the action was tried *may perform those duties.*

(Emphasis added). The language of this rule grants broad authority to a successor judge to perform any duty that could have been performed by the predecessor judge. In *Tennant v. Marion Health Care Foundation, Inc.,* Justice Cleckley, quoting from *Moore's Federal Practice,* observed that:

> "the new judge may perform any action which the first judge could have taken had he not become disabled.... [I]f the transcript of the proceedings is sufficient, he may also rule upon any post-trial motions made by the parties, including a motion for judgment n.o.v. or a motion for a new trial." James Wm. Moore, *Moore's Federal Practice* ¶ 63 at 63–10 (1995).

194 W.Va. 97, 105, 459 S.E.2d 374, 382 (1995).

█ The broad authority afforded successor judges is also evidenced in the standard of review we apply to their rulings. In Syllabus point 1 of *Tennant v. Marion Health Care Foundation, Inc.,* we held:

> Once a successor judge is properly assigned pursuant to Rule 63 of the West Virginia Rules of Civil Procedure and Rule XVII of the West Virginia Trial Court Rules for Trial Courts of Record, *his or her decision or judgment is to be reviewed on appeal under the same standard that would have been applied to the decision of the original trial judge.* To do otherwise would disrupt the administration of justice. To the extent that our prior cases are inconsistent with this decision, they are expressly overruled.

*Id.* (emphasis added).[24] The fact that we apply the same standard of review to decisions made by a successor judge as we would to those of his or her predecessor suggests that the successor judge has the same authority to act as would his or her predecessor. Thus, we hold generally that, when a successor judge is properly assigned pursuant to Rule 63 of the West Virginia Rules of Civil Procedure, such successor judge steps into the shoes of his or her predecessor and, when the transcript of the proceedings is sufficient, may take any action that such predecessor may properly have taken, either upon proper motion or *sua sponte.*[25] Accord *United States Gypsum Co. v. Schiavo Bros., Inc.,* 668 F.2d 172, 176 (3d Cir.1981) ("[W]here a successor judge is asked by timely and proper motion to reconsider the

---

**24.** Justice Cleckley qualified this holding in footnote 3 of *Tennant v. Marion Health Care,* which states, in part:

> In deciding post-trial motions, we recognize one exception to the rule that a successor judge steps completely into his or her predecessor's shoes. When the issue is purely one of fact that was previously determined by the *jury,* the successor judge's powers to alter or limit the verdict is [sic] limited. Therefore, when a successor judge alters or amends a factual determination under these circumstances, this Court is not required to give deference to the successor judge's determination. *Thompson v. Sawyer,* 678 F.2d 257 (D.C.Cir. 1982).

194 W.Va. at 105 n. 3, 459 S.E.2d at 382 n. 3 (emphasis added). Here, the issue addressed by Judge Hatcher was not an issue that was previously determined by the jury. Consequently, we need not address this limitation to a successor judge's authority.

**25.** This general rule is not without limitation. See *supra* note 24.

We also note that while a successor judge has the authority to perform any act that the predecessor judge could have performed, whether or not the successor judge should exercise that authority is within his or her discretion. With respect to Rule 63, Justice Cleckley commented, in *Tennant v. Marion Health Care:* "Once chosen, a successor judge is given broad discretion in determining whether he or she properly can perform the remaining duties in a trial in which he or she did not preside." 194 W.Va. at 104, 459 S.E.2d at 381.

legal conclusions of an unavailable predecessor, he or she is empowered to reconsider those issues to the same extent that his or her predecessor could have."); *Golf City, Inc. v. Wilson Sporting Goods, Co., Inc.*, 555 F.2d 426, 438 n. 20 (5th Cir.1977) (noting that successor judge may make new findings of fact and conclusions of law on existing record).

In the case *sub judice*, Judge Abbot granted a new trial on damages. That ruling kept the action alive, and, thus, would have permitted Judge Abbot to reconsider his ruling on Sopher's motion for a new trial had he seen fit to do so. *See Coleman v. Sopher*, 194 W.Va. 90, 94–95, 459 S.E.2d 367, 371–72 (1995) (observing that "the order granting the defendant's motion for a new trial, far from ending the case, requires both parties to go forth on the damage issue again"). In an ongoing action, a trial judge has the authority to reconsider his or her previous rulings, including an order granting a new trial. "An order granting a new trial is interlocutory and destroys the finality of the judgment. Since [a trial] court has plenary power to reconsider, revise, alter, or amend an interlocutory order, the court has the power to take any action with respect to an order granting a new trial." 12 James Wm. Moore et al., *Moore's Federal Practice*, § 59.43[1] (3d ed.1997) (footnotes omitted). *See Caldwell v. Caldwell*, 177 W.Va. 61, 63, 350 S.E.2d 688, 690 (1986) (discussing general rule that interlocutory orders are left to the plenary power of the trial court). *See also Gallimore v. Missouri Pacific R.R. Co.*, 635 F.2d 1165, 1171 (5th Cir.1981) (quoting *Moore's Federal Practice*, and holding that trial court could reconsider, "upon motion or *sua sponte*," an "earlier order granting a new trial").[26] Because Judge Abbot could have reconsidered his earlier ruling, likewise,

Judge Hatcher had the authority, in light of the complete record available in this case, to reconsider the earlier ruling.

Having determined that Judge Hatcher had the authority to reconsider Judge Abbot's earlier rulings, we must now determine whether he erred in his conclusions upon reconsideration. As previously stated, Judge Hatcher's actions are reviewed under the same standard we would apply to rulings of the original trial judge. Here, Sopher complains of Judge Hatcher's rulings on his motion for a new trial or remittitur. Remittitur typically arises in connection with a motion for a new trial,[27] as it did in this case. Consequently, we will consider these issues together and apply the standard for reviewing a trial court's ruling on a motion for a new trial to our consideration.

> As a general proposition, we review a circuit court's rulings on a motion for a new trial under an abuse of discretion standard. *In re State Public Building Asbestos Litigation*, 193 W.Va. 119, 454 S.E.2d 413 (1994).... Thus, in reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

*Tennant v. Marion Health Care*, 194 W.Va. at 104, 459 S.E.2d at 381. With due consideration for the appropriate standard of review, we proceed to consider Judge Hatcher's ruling.

---

**26.** Similar to the case *sub judice*, in *Gallimore v. Missouri Pacific R.R. Co.*, 635 F.2d 1165 (5th Cir.1981), the decision to reconsider the earlier grant of a new trial was made by a successor judge. In *Gallimore*, the United States Court of Appeals for the Fifth Circuit explained that, prior to the second trial before the district court, the case had been transferred to a different district judge. The court did not explain the reason for this transfer. The successor judge in *Gallimore* reconsidered an earlier order by his predecessor due to an intervening decision by the Court of

Appeals, which clarified the resolution of the underlying issue involved.

**27.** See generally 13B Michie's Jurisprudence *New Trials* § 55 (1988) ("The typical situation in which [remittitur] is employed is where, on a motion by the defendant for a new trial, the verdict is considered excessive and the plaintiff is given an election to remit a portion of the amount of the verdict or submit to a new trial." (footnote omitted)).

We have previously set forth the criteria a trial judge may consider in determining whether to grant a new trial:

> If the trial judge finds the verdict is against the clear weight of the evidence, is based on false evidence or will result in a miscarriage of justice, the trial judge may set aside the verdict, even if supported by substantial evidence, and grant a new trial. A trial judge's decision to award a new trial is not subject to appellate review unless the trial judge abuses his or her discretion.

Syl. pt. 3, in part, *In re State Public Bldg. Asbestos Litig.*, 193 W.Va. 119, 454 S.E.2d 413 (1994).[28] Before this Court, Sopher argues that he is entitled to remittitur or a new trial on damages because the jury verdict was excessive. In that regard, we have held:

> "Courts must not set aside jury verdicts as excessive unless they are monstrous, enormous, at first blush beyond all measure, unreasonable, outrageous, and manifestly show jury passion, partiality, prejudice or corruption." Syl. Pt., *Addair v. Majestic Petroleum Co., Inc.*, 160 W.Va. 105, 232 S.E.2d 821 (1977).

Syl. pt. 5, *Roberts v. Stevens Clinic Hosp., Inc.*, 176 W.Va. 492, 345 S.E.2d 791 (1986). We agree with Judge Hatcher's conclusion that the verdict was not excessive and, thus, Sopher was not entitled to remittitur or a new trial on damages.

Judge Hatcher's final order denying Sopher's motions recounted his thorough review of the record of this action. It also contained detailed findings of fact and conclusions of law upon which he based his decision to deny a new trial on damages and to reinstate the jury verdict. In his order, Judge Hatcher explained:

**28.** The first portion of Syl. pt. 3, *In re State Public Building Asbestos Litigation*, 193 W.Va. 119, 454 S.E.2d 413 (1994), states:

> A motion for a new trial is governed by a different standard than a motion for a directed verdict. When a trial judge vacates a jury verdict and awards a new trial pursuant to Rule 59 of the *West Virginia Rules of Civil Procedure*, the trial judge has the authority to weigh the evidence and consider the credibility of the witnesses.

[T]he Court concludes that the Defendant's motion to set aside the jury verdict should be denied.... Quite simply, the Court concludes that the jury believed that the Defendant intentionally did something with the decedent's heart, that the Plaintiffs, a widow and two children, suffered, and were entitled to be compensated in the total amount of $135,000.00, with the further belief that an additional $50,000.00 should be awarded as punitive damages in order to punish the Defendant for his conduct. Additionally, the Court finds that the Defendant is not statutorily immune from suit in this case.

As to the Defendant's request for a remittitur, the Court finds nothing in the case to cause the Court to conclude that the jury's verdict was, at first blush, excessive, enormous, monstrous, outrageous, unreasonable or beyond all measure. Further, the Court finds nothing in the case to indicate that the jury's verdict manifestly displays jury passion, partiality, corruption or prejudice....

... The Court believes that the determination of damages is clearly within the province of the jury, the fact finder, and the jury's verdict should not be disturbed by the Court unless it can be shown that the jury's verdict was the result of, in whole or in part, prejudice, partiality, corruption or some misunderstanding or mistaken view of the merits of the case. The Court, upon thorough consideration of the evidence in this case, concludes that no such showing was made by the Defendant.

We have thoroughly reviewed the record, the arguments of the parties, and Judge Hatcher's order, and we cannot conclude that Judge Hatcher abused his discretion by denying Sopher's motion for a new trial or for

A successor judge is not afforded the same authority to consider the credibility of witnesses as the judge who presided at trial. This issue arises where a successor judge enters a ruling that vacates a jury verdict. Under that circumstance, we may be called upon to consider whether the successor judge vacated the verdict as a matter of law, or whether such ruling required consideration of the credibility of witnesses. Because judge Hatcher reinstated the jury verdict upon finding no error at trial, we need not concern ourselves with this issue.

remittitur. Upon consideration of the bizarre nature of this case, and the jury's determination of Sopher's liability, we do not find the award of $135,000.00 in compensatory damages[29] for the emotional suffering of three separate individuals to be monstrous, enormous, at first blush beyond all measure, unreasonable or outrageous. In addition, we find that Sopher failed, below and before this Court, to demonstrate that the jury's verdict manifestly showed jury passion, partiality, prejudice or corruption. Each of the Colemans testified about the effect that discovery of the unauthorized removal of Elmer's heart had had on them. They described physical illness, uncontrollable crying, nightmares and familial tension which culminated in a family member moving out of the family home. We think this evidence was sufficient to support the jury verdict in this case.[30] Consequently, we find that Judge Hatcher did not abuse his discretion in denying Sopher's motion for a new trial or remittitur.

### III.

### CONCLUSION

For the foregoing reasons, we affirm the May 2, 1996, order of the Circuit Court of Fayette County.

Affirmed.

MAYNARD, Justice, dissenting:

(Filed Nov. 21, 1997)

To begin with, there is simply no tort here. This case is just another example of some of the craziness going on in the American judicial system today. This case is not about righting a wrong, it is all about the relentless pursuit of money. It is a fake claim based on imagined evidence.

First, this family *sought* an autopsy of their loved one. The family claims the autopsy was done at their request, absent which the autopsy would not have been performed. For what purpose did they seek to have the body of their loved one dissected? Not for medical science or to solve a crime. They wanted their loved one dissected in order to get a black lung check. Their sensibilities were not offended in the least by having the body of their loved one cut open, bones sawed apart and organs removed and examined. In fact, that is exactly what they wanted done so they could get the black lung check.

After the first autopsy, the remains of the deceased were interred. The plaintiffs then had the coffin disinterred, the body exhumed and dissected a second time in a second autopsy, all in their dogged effort to win the black lung claim. The body was autopsied the second time by Dr. E. Hansbarger. It was done in a poorly lit, dingy back room at the mausoleum. Dr. Hansbarger wanted to take the body outside and do the dissection behind the building in broad daylight. Cemetery officials refused to allow him to do so. None of these facts disturbed the family.

Dr. Hansbarger then took the lungs and central chest from the body, put the organs in plastic bags, took them in the bags to his lab and analyzed them. Then he *disposed* of them. The lungs and central chest were never returned to the body and were not reinterred. Oddly, these facts did not offend the family. They are not in the least upset that Dr. Hansbarger disposed of the deceased's lungs and central chest, but they are emotional wrecks because the heart is not with the body. Dr. Hansbarger further testified at trial that it was possible he missed

---

**29.** We limit our discussion to compensatory damages as Sopher does not challenge the jury's award of $50,000.00 in punitive damages, which was left undisturbed by the trial court.

**30.** Sopher also argues that the compensatory damages award in this case is excessive in that it is based entirely on the plaintiffs' mental distress. He cites this Court's decision in *Bennett v. 3 C Coal Co.*, 180 W.Va. 665, 379 S.E.2d 388 (1989), to support this contention. In concluding that the verdict in *Bennett* was excessive and warranted a new trial on damages, we recognized that

"the entire damage award was predicated on the plaintiff's mental distress." *Id.* at 674, 379 S.E.2d at 397. However, our decision in *Bennett* was also influenced by the fact that plaintiff's counsel improperly "mentioned the amounts sued for in both his opening statement and closing argument." *Id.* We found that the influence this disclosure had on the jury was evidenced by the fact that the jury award closely mirrored the amounts revealed by plaintiff's counsel. *Id.* Sopher has pointed to no such error in this case.

the presence of the heart during his autopsy. Dr. Sopher also testified he did not remove the heart during the first autopsy and his written records reflect that as well. Based on this kind of appallingly weak evidence, this Court has upheld a simply awful verdict.

I further dissent because I believe the circuit court abused its discretion by admitting testimony at trial that Dr. Sopher had donated brain tissue to the Marshall University Medical School without notice to decedents' family members in the past.

The majority declines to address the West Virginia Rule of Evidence 404(b) issue because it finds Dr. Sopher failed to raise, on the record, the specific errors he now asserts in his appeal to this Court. The majority notes that Dr. Sopher's counsel made two objections pertaining to the form of the particular question being asked Dr. Sopher on cross-examination and one objection based on relevancy. The majority states further that "[w]hile the record indicates that Sopher presented a motion *in limine* for the exclusion of the evidence herein complained of, the record fails to establish that the specific challenges now raised were presented to or addressed by the court below. Thus, Sopher failed to preserve these alleged errors." I disagree with the majority's assessment of what the record reveals concerning Dr. Sopher's preservation of the errors now raised in this Court.

Although the portion of the pre-trial proceedings relevant to this issue is anything but a model of clarity, I believe Dr. Sopher's counsel said enough to give the trial court an opportunity to address the issue at a time when corrective action could have been taken. West Virginia Rule of Evidence 404(b) provides, in part, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Based on this rule, Dr. Sopher now asserts, in part, that the testimony at issue "only tended to prove [his] character and his propensity to act in conformity therewith." A careful reading of portions of the pre-trial proceedings of October 1, 1992 reveals a dialogue between the court, Mr. Cometti, attorney for the appellees, and Mr. Johns, attorney for Dr. Sopher, concerning proposed evidence, including testimony that Dr. Sopher's office "had shaved off parts of brains from cadavers in their custody and sent to Marshall University" for the purpose of general experimentation. After much discussion, the court determined "that probably this evidence would be admissible. *At least, I don't think I ought to sustain the motion in limine*" (emphasis added). Dr. Sopher's attorney responded by requesting permission to submit additional cases on the issue and stated, in part, "I did not think that this would be something that would be a difficult issue. *I thought the law was fairly straight forward that you can't use other similar acts to show that that's the way someone acted on this occasion ...*" (emphasis added). He then proceeded to argue that the evidence in question did not properly set forth a pattern or habit of behavior. In fact, the discussion at the preliminary hearing precipitated by Dr. Sopher's motion *in limine* concerning the testimony at issue, as well as other evidence, is quite in-depth and covers twelve pages of transcript. It is obvious to me, and it should be obvious to the majority, that Dr. Sopher's attorney presented the circuit court with a sufficiently specific legal argument in order to adequately preserve the error assigned in his appeal to this Court.

In addition, the trial transcript reveals that when the appellees' counsel elicited the testimony at issue from Dr. Sopher on cross-examination, Dr. Sopher's counsel stated "I object to his line of questioning on the basis of irrelevance." Clearly, counsel objected and he objected on grounds of relevance. How the majority can claim that a proper objection, timely made and based on relevancy, failed to adequately preserve the error now raised on appeal is a mystery to me. The purpose of Rule 404 is to determine relevance. The title of Article IV of the West Virginia Rules of Evidence, which includes Rules 401 through 411, is "RELEVANCY AND ITS LIMITS." Each and every rule from 401 through 411 deals with relevancy and only with relevancy. Obviously then, an objection at trial to the admission of evidence based on relevancy should be

sufficient to preserve an error grounded in Rule 404(b).

Since filing a motion *in limine* resulting in a hearing covering twelve pages of transcript is not sufficient to preserve an error on appeal, and raising an objection at trial based on relevancy is likewise insufficient, I am at a loss to know what a lawyer in West Virginia has to do to preserve an error for purposes of appeal.

I believe, also, that if the Court had considered Dr. Sopher's Rule 404(b) assignment of error, it would have found the testimony at issue to be inadmissible. In Syllabus Point 8 of *TXO Production v. Alliance Resources,* 187 W.Va. 457, 419 S.E.2d 870 (1992) [1] this Court formulated the standard of admissibility under Rule 404(b):

> Protection against unfair prejudice from evidence admitted under Rule 404(b) of the *West Virginia Rules of Evidence* [1985] is provided by: (1) the requirement of Rule 404(b) that the evidence be offered for a proper purpose; (2) the relevancy requirement of Rule 402—as enforced through Rule 104(b); (3) the assessment the trial court must make under Rule 403 to determine whether the probative value of the similar acts evidence is substantially outweighed by its potential for unfair prejudice; and, (4) Rule 105, which provides that the trial court shall, upon request, instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted.

In Syllabus Points 1 and 2 of *State v. McGinnis,* 193 W.Va. 147, 455 S.E.2d 516 (1994) this Court expanded upon this standard by stating:

> 1. When offering evidence under Rule 404(b) of the West Virginia Rules of Evidence, the prosecution is required to identify the specific purpose for which the evidence is being offered and the jury must be instructed to limit its consideration of the evidence to only that purpose. It is not sufficient for the prosecution or the trial court merely to cite or mention the litany of possible uses listed in Rule 404(b). The specific and precise purpose for which the evidence is offered must clearly be shown from the record and that purpose alone must be told to the jury in the trial court's instruction.
>
> 2. Where an offer of evidence is made under Rule 404(b) of the West Virginia Rules of Evidence, the trial court, pursuant to Rule 104(a) of the West Virginia Rules of Evidence, is to determine its admissibility. Before admitting the evidence, the trial court should conduct an *in camera* hearing as stated in *State v. Dolin,* 176 W.Va. 688, 347 S.E.2d 208 (1986). After hearing the evidence and arguments of counsel, the trial court must be satisfied by a preponderance of the evidence that the acts or conduct occurred and that the defendant committed the acts. If the trial court does not find by a preponderance of the evidence that the acts or conduct was committed or that the defendant was the actor, the evidence should be excluded under Rule 404(b). If a sufficient showing has been made, the trial court must then determine the relevancy of the evidence under Rules 401 and 402 of the West Virginia Rules of Evidence and conduct the balancing required under Rule 403 of the West Virginia Rules of Evidence. If the trial court is then satisfied that the Rule 404(b) evidence is admissible, it should instruct the jury on the limited purpose for which such evidence has been admitted. A limiting instruction should be given at the time the evidence is offered, and we recommend that it be repeated in the trial court's general charge to the jury at the conclusion of the evidence.

In the recent case of *Stafford v. Rocky Hollow Coal Company,* 198 W.Va. 593, 482 S.E.2d 210 (1996), this Court utilized this very standard. In *Stafford,* the plaintiff instituted a civil action against his former employer alleging, among other things, wrongful discharge and breach of an employment

---

1. The holding in *TXO* was modified by *State v. McGinnis,* 193 W.Va. 147, 455 S.E.2d 516 (1994) in that *McGinnis* held that the admissibility of Rule 404(b) evidence must be determined as a preliminary matter under Rule 104(a) rather than 104(b). Also, *Alkire v. First Nat. Bank of Parsons,* 197 W.Va. 122, 475 S.E.2d 122 (1996) modified the holding in *TXO* on grounds not relevant here.

contract. A verdict was returned in favor of the plaintiff, and the employer appealed to this Court claiming, *inter alia,* that the trial court admitted evidence of prior bad acts of the employer in violation of Rule 404(b). After assessing the facts in light of the above-stated standard, this Court determined that the trial court did not conduct the requisite analysis prior to the admission of the prior bad acts evidence and, consequently, reversed the verdict and remanded the matter for further proceedings.

In the present case, a properly conducted assessment of the testimony at issue in light of the standard stated above would likewise result in a determination that the trial court abused its discretion in admitting the testimony. I believe that the testimony that Dr. Sopher donated brain tissue to the Marshall University Medical School in the past without notifying relatives tended only to prove Dr. Sopher's character and his propensity to act in conformity therewith. Although the appellees elicited the testimony for the stated purpose of showing motive or intent, they failed to explain how such evidence proved that Dr. Sopher would have a motive for removing or that he intentionally removed Coleman's heart. Further, this Court stated in Syllabus Point 9 of *State v. Derr,* 192 W.Va. 165, 451 S.E.2d 731 (1994):

> Although Rules 401 and 402 of the West Virginia Rules of Evidence strongly encourage the admission of as much evidence as possible, Rule 403 of the West Virginia Rules of Evidence restricts this liberal policy by requiring a balancing of interests to determine whether logically relevant is legally relevant evidence. Specifically, Rule 403 provides that although relevant, evidence may nevertheless be excluded when the danger of unfair prejudice, confusion, or undue delay is disproportionate to the value of the evidence.

"The balancing necessary under Rule 403 must affirmatively appear on the record." *McGinnis,* 193 W.Va. at 156, 455 S.E.2d at 525. Here, the trial court failed to perform the Rule 403 balancing test. In addition, the trial court failed to give a limiting instruction either when the testimony was given or in the general jury instructions. Interestingly,

in the pre-trial hearing when the testimony at issue, as well as other challenged evidence, was discussed, the court warned the appellees' counsel concerning the admission of the challenged evidence, "if that evidence is not admissible, I think it's so prejudicial that I can't cure it with a curity (*sic*) instruction." The trial court was exactly right on that point. This was highly prejudicial evidence that nevertheless was admitted against Dr. Sopher.

Also, after finding that Dr. Sopher "intentionally removed the heart of Elmer Coleman and should have known that the intentional removal of Elmer Coleman's heart would cause the plaintiffs emotional distress," the jury awarded Mary Coleman $75,000 in compensatory damage, and the two children, Wesley and Michelle Coleman, $30,000 each in compensatory damages. These amounts were reduced by the court to $50,000 for Mary Coleman and $10,000 each to the two children. The jury awarded punitive damages against Dr. Sopher in the amount of $50,000. This Court upheld the punitive damages award.

In Syllabus Point 8 of *Dzinglski v. Weirton Steel Corp.,* 191 W.Va. 278, 445 S.E.2d 219 (1994) this Court stated:

> In permitting recovery for emotional distress without proof of physical trauma when the distress arises out of the extreme and outrageous conduct ⋅ intentionally caused by the defendant, damages awarded for the tort of outrageous conduct are essentially punitive damages. Therefore, in many cases emotional distress damages serve the policy of deterrence that also underlies punitive damages.

Even though *Dzinglski* was decided after the trial in this case, the Court noted in *Dzinglski* that

> In *Mace v. Charleston Area Medical Center Foundation, Inc.,* 188 W.Va. 57, 422 S.E.2d 624, 633 (1992), we expressed our concern that in cases where damages for emotional distress are sought, "a claim for emotional distress without any physical trauma may permit a jury to have a rather open-hand in the assessment of damages." In *Wells v. Smith,* 171 W.Va. 97, 297 S.E.2d 872 (1982), we recognized that in

permitting recovery for emotional distress without proof of physical trauma where the distress arises out of the extreme and outrageous conduct intentionally caused by the defendant, damages awarded for the tort of outrageous conduct are essentially punitive damages.

Therefore, in this case, I believe the plaintiffs were allowed a double recovery by allowing the jury "to stack punitive damages upon punitive damages, thereby effectively imposing two punitive damage verdicts against [Dr. Sopher] for the same acts." *Dzinglski*, 191 W.Va. at 288, 445 S.E.2d at 229.

The plain fact is the majority dropped the ball on this one, particularly on the Rule 404(b) issue. It declines to address the merits of the issue by holding Dr. Sopher to a ridiculously high standard for preservation of his objection for assignment of error to this Court. By doing so, it upholds the admission of evidence against Dr. Sopher that was clearly prejudicial. Also, this Court manages to be inconsistent. Eleven months ago a verdict was reversed in this Court where prior act evidence was wrongly admitted. *Stafford, supra*. In the case at bar, this Court has upheld a verdict where prejudicial prior act evidence was admitted. With its refusal to properly address the Rule 404(b) issue, the majority is splitting legal hairs, a practice at which lawyers are experts. Here, however, such behavior results in inconsistent principles, inconsistent results, and the affirming of a verdict based, in part, on improper evidence. Therefore, I dissent.

McHUGH, Justice, Concurring:

(Filed Dec. 18, 1997)

It is unfortunate that the dissenting opinion distorts the majority's holding and legal analysis. I fully support the legal analysis and conclusion of the majority opinion in this case. I write this concurring opinion to emphasize the necessity for properly preserving evidentiary objections for appeal.

In this appeal counsel for Dr. Sopher has asked this Court to modify the requirements for preserving evidentiary objections. Dr. Sopher proposes, by his arguments, that the standard be relaxed as it relates to one particular issue: admission of testimony that Dr. Sopher previously donated brain tissue from deceased individuals without notifying the relatives of the decedents. Counsel for Dr. Sopher did not comply with the traditional standards to which all trial attorneys must adhere in order to preserve a Rule 404(b) objection for appellate review. The majority opinion correctly refused to deviate from the standards which are necessary to preserve an evidentiary assignment of error. *See State v. Boyd,* 166 W.Va. 690, 698, 276 S.E.2d 829, 834 (1981) ("It is clear under our law, that as to evidentiary errors, an attorney must preserve them on the record or be foreclosed from raising them on appeal".). (Citations omitted).

In this appeal, Dr. Sopher contends that the trial court should have excluded testimony relating to his removal of brain tissue from other deceased individuals. Dr. Sopher argued that such evidence was inadmissible under Rule 404(b). In his brief, Dr. Sopher argued that he made a motion in limine asking the trial court to exclude testimony of his prior conduct under Rule 404(b), and that the motion was denied. Dr. Sopher also argues that during the trial he again raised the Rule 404(b) argument and the trial court overruled his objection. The motion in limine and the trial objection should be separately addressed.

*The Motion In Limine*

To support his contention that he made a motion in limine raising the Rule 404(b) issue, Dr. Sopher's brief references pages 4–12 of a pretrial hearing. The record discloses no written motion. Moreover, a careful reading of the referenced pages fails to disclose any mention of Dr. Sopher's counsel requesting the trial court exclude the evidence under Rule 404(b). *See* Syl. Pt. 1, *Estep v. Brewer,* 192 W.Va. 511, 453 S.E.2d 345 (1994). ("Where objections were not shown to have been made in the trial court, and the matters concerned were not jurisdictional in character, such objections will not be considered on appeal".). However, in piecing together particular words scattered throughout the above-referenced pages, one

can discern that an objection was made to the brain tissue testimony. The meaningful legal language which was articulated on the record were the words "routine" and "habit". Those words define an objection pursuant to Rule 406, not Rule 404(b).

It may very well be that Dr. Sopher's counsel in fact discussed Rule 404(b) with the trial court as was argued in his brief. Assuming this occurred, the critical mistake made by Dr. Sopher's counsel was having the Rule 404(b) discussion and argument off the record. The pages to which Dr. Sopher referenced reveal that the parties went off the record when making such argument, if it was made.[1]

### Dr. Sopher's Argument: Off the Record

Dr. Sopher could have properly presented the unrecorded alleged Rule 404(b) argument before this Court if such an argument was made and the argument was omitted from the transcript. Pursuant to Rule 9(f) of this Court's Rules of Appellate Procedure, "[a]ny omission, misstatement, or error, either clerical or otherwise, in the record may be corrected at any time by stipulation filed with the Supreme Court". Under this provision of our appellate rules, Dr. Sopher was required to obtain and file with this Court a stipulation, agreed to by the opposing party (and trial judge had he not passed away), which outlined the substance of any omitted Rule 404(b) discussion. *See Dupre v. Fru–Con Engineering Inc.*, 112 F.3d 329 (8th Cir.1997) (noting that under federal appellate rules counsel is required to file a motion to modify content of record to disclose what counsel alleged actually transpired off the record in district court). *See also* Federal Rules of Appellate Procedure, Rule 10(e).

The stipulation requirement of Rule 9(f) establishes a standard that is applicable to all attorneys who seek to have this Court consider an objection not appearing on the record. Counsel for Dr. Sopher, in the final analysis, would have this Court deviate from its long established standard and permit the averments in his brief to be accepted as accurately depicting what occurred. "Lacking this documentation, counsel's [allegations] amounted to nothing more than an attorney's argument lacking evidentiary support". *Powderidge Unit Owners Ass'n v. Highland Properties, Ltd.*, 196 W.Va. 692, 707, 474 S.E.2d 872, 887 (1996). "[S]elf-serving assertions without factual support in the record will not [suffice]". *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 61 n. 14, 459 S.E.2d 329, 338 n. 14 (1995). The majority has correctly held counsel for Dr. Sopher to the well-reasoned standard of Rule 9(f) with which all attorneys must comply.

### Motion in Limine: No Definitive Ruling During the Pretrial Hearing

The next issue concerns the ruling by the trial court on Dr. Sopher's motion in limine. The record of the pretrial proceeding clearly reveals that the trial court *did not* make a definitive ruling on the motion during the pretrial hearing. The transcript clearly illustrates that once trial counsel and the court were again on the record, the trial judge indicated he was prepared to rule *against* Dr. Sopher's motion. Dr. Sopher's counsel specifically asked the court to defer a definitive ruling until he was allowed to submit case law that would support his motion. The trial court agreed to defer a definitive ruling on the motion until the morning of the trial, which was the next day.[2] A careful review of

---

1. At the point in the transcript when the parties came on record, the transcript describes a possible Rule 406 discussion, based upon the use of the words "routine" and "habit". Rule 406 states:

 Rule 406. Habit; routine practice.
 Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

2. The following exchange occurred between the trial court and counsel for Dr. Sopher:

 THE COURT: ... I believe that probably this evidence would be admissible. At least, I don't think I ought to sustain the motion in limine.
 MR. JOHNS: Can I submit further cases on this in the morning, Your Honor?
 THE COURT: Oh, gosh. Why didn't you do it already? I thought you were ready for me to rule.
 . . .

the next morning's transcript discloses no discussion or renewal of the in limine motion. *See Waldron v. Waldron,* 73 W.Va. 311, 317, 80 S.E. 811, 814 (1913) ("If a party who has made an objection permits it to be forgotten, a waiver should be chargeable to the party".); Syl. Pt. 1, *Maples v. West Virginia Dept. of Commerce,* 197 W.Va. 318, 475 S.E.2d 410 (1996) ("A litigant may not silently acquiesce to an alleged error, or actively contribute to such error, and then raise that error as a reason for reversal on appeal".); *In Interest of S.C.,* 168 W.Va. 366, 374, 284 S.E.2d 867, 880 (1981). Ultimately, then, the trial court never entered a definitive ruling on the motion in limine. *See Tennant v. Marion Health Care Foundation, Inc.,* 194 W.Va. 97, 114, 459 S.E.2d 374, 391 (1995) ("It is not the role of the trial judge to present evidence.... [T]he party complaining on appeal of the admission of evidence bears sole responsibility for adequately preserving the record on meaningful appellate review".); *Voelker v. Frederick Business Properties Co.,* 195 W.Va. 246, 256, 465 S.E.2d 246, 256 (1995) ("[S]imply raising the issue before the trial judge is insufficient. Attorneys have an obligation to protect the record in relation to rulings by trial judges on specific issues".).

This Court held in syllabus point 1 of *Wimer v. Hinkle,* 180 W.Va. 660, 379 S.E.2d 383 (1989) that:

> An objection to an adverse ruling on a motion in limine to bar evidence at trial will preserve the point, even though no objection was made at the time the evidence was offered, unless there has been a significant change in the basis for admitting the evidence.

*Accord,* Syl. Pt. 6, *Bennett v. 3 C Coal Co.,* 180 W.Va. 665, 379 S.E.2d 388 (1989). *Wimer* holds that as a general matter, an attorney does not have to raise at trial an objection that was properly preserved through a motion in limine. However, the *Wimer* rule is inapplicable when the motion in limine ruling was not properly preserved. *See State v.*

*Parsons,* 181 W.Va. 56, 63, 380 S.E.2d 223, 230 (1989) (where trial court has not ruled on motion in limine, party must object to introduction of evidence at trial in order to preserve right to appeal admission of evidence); *Pandit v. American Honda Motor Co., Inc.,* 82 F.3d 376 (10th Cir.1996) (utilizing a three-part test to determine whether party must renew motion in limine at trial to preserve issue for appeal; reviewing court must be satisfied that matter was adequately presented to district court, that issue was of type that can be finally decided prior to trial, and that court's ruling was definitive).

The legal consequence of failing to address the issue the next morning meant that the trial court's prior tentative motion in limine ruling was insufficient, standing alone, to preserve the matter for appeal. Dr. Sopher had to renew his alleged Rule 404(b) motion at trial in order to have the issue preserved for appeal. The *Wimer* rule does not apply. *See Green Const. Co. v. Kansas Power & Light Co.,* 1 F.3d 1005 (10th Cir.1993) (party waived objection to denial of motion in limine to exclude evidence where party failed to renew objection during trial, after district court had indicated that ruling would be subject to reconsideration at trial); *Dow v. United Broth. of Carpenters and Joiners of America,* 1 F.3d 56 (1st Cir.1993) (holding that when court defers ruling on request and proponent thereafter fails to resurrect issue in timely fashion, proponent is deemed to have abandoned point and cannot later complain on appeal); *Gill v. Thomas,* 83 F.3d 537 (1st Cir.1996) (when in limine motion to exclude evidence is denied counsel must renew objection at trial to preserve right to appeal admission of the contested evidence); *Dillon v. Nissan Motor Co., Ltd.,* 986 F.2d 263 (8th Cir.1993) (alleged error was not preserved for appellate review where plaintiffs failed to renew objections made in connection with their motion in limine); *McEwen v. City of Norman,* 926 F.2d 1539 (10th Cir.1991) (objection raised at hearing on motion to ex-

MR. JOHNS: Your Honor, I didn't mean to argue with you after your ruling. I was just asking you if I could submit other cases.
THE COURT: If you want me to reconsider this, I'll do it first thing in the morning....
...

MR. COMETTI: If Mr. Johns is going to re-argue this thing in the morning, I'd like to do it before the jury gets in here at 9:30.
THE COURT: My 9:00 just cancelled. So the jury will be here at 9:30. I told them, didn't I? We can come in here at 9:00....

clude testimony was insufficient to preserve issue absent contemporaneous objection at trial); *Petty v. Ideco*, 761 F.2d 1146 (5th Cir.1985) (party whose motion in limine is overruled must renew objection at trial); *State v. Merrill*, 252 Neb. 736, 566 N.W.2d 742 (1997) (when court overrules motion in limine, movant must object when particular evidence, previously sought to be excluded by motion, is offered).

Dr. Sopher failed to make a Rule 404(b) objection at trial. Therefore, even if the majority opinion had modified the standard for preserving a motion in limine objection, by a determination that Dr. Sopher had in fact raised a Rule 404(b) argument at the pretrial hearing, the issue was not preserved for appeal purposes absent a renewal of the objection at trial. *See Clausen v. Sea–3, Inc.*, 21 F.3d 1181 (1st Cir.1994) (denial of motion in limine did not preserve issue for review absent timely objection at trial to admission of such evidence).

### The Trial Objection: No Reasonable Specificity

Dr. Sopher contends in his brief that he sought to exclude evidence of his prior conduct pursuant to Rule 404(b). The brief of Dr. Sopher referred this Court to the point of trial when the alleged Rule 404(b) objection was raised. In reviewing the trial transcript pages referred to in the brief, I find that counsel for Dr. Sopher initially objected by simply stating the matter was irrelevant. Two other objections were made. Both objections related to the form of the questions and not the substance of the question.

Dr. Sopher asks this Court to allow an objection of relevancy to be considered as a Rule 404(b) objection. The majority opinion refused to adopt such a rule. *See United States v. Wilson*, 31 F.3d 510 (7th Cir.1994) (in absence of Rule 404(b) objection defendant waived objection to the drug dealer's testimony that he had seen defendant in possession of cocaine on at least ten occasions); *Hollenback v. United States*, 987 F.2d 1272 (7th Cir.1993) (by failing to raise Rule 404(b) as possible bar to drug use testimony, defendant waived objection); *United States v. Dunn*, 758 F.2d 30 (1st Cir.1985) (failure to object to certain extensive testimony under Rule 404(b) constituted a waiver of objection); *State v. Burton*, 326 S.C. 605, 486 S.E.2d 762 (App.1997) (failure to raise proper objection when evidence is offered constitutes waiver of right to object); *Asberry v. State*, 813 S.W.2d 526 (Tex.App.—Dallas 1991) (in absence of appropriate Rule 404(b) objection in trial court nothing is preserved for appellate review). An objection as to relevance cannot automatically trigger a 404(b) objection. No court in the country has such a relaxed standard. To comply with the traditional standard, trial counsel must make the objection with reasonable specificity. This Court addressed that precise issue in *In re Tiffany Marie S.*, 196 W.Va. 223, 234, 470 S.E.2d 177, 188 (1996):

> The West Virginia Rules of Evidence declare that parties must object to the wrongful offer of evidence at a particular time and with reasonable specificity. The failure to object at the time and in the manner designated by Rule 103(a) of the West Virginia Rules of Evidence is treated as a procedural default, with the result that the evidence, even if erroneous, becomes the facts of the case.

*In re Tiffany Marie S.* articulated a standard of "reasonable specificity" for making an objection. Common sense dictates that the mere objection of "irrelevant" is not reasonably specific to alert a trial court or this Court that a Rule 404(b) objection is being made.

Essentially, the dissenting opinion seeks a "Sopher exception" simply because the writer does not like the result in this case. A more solid legal argument would have resulted in a more solid dissent.