IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2019 Term

_____

No. 18-0214

_____

FILED

**June 5, 2019**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

JAMES H. HARRELL, JR. and
BETSY J. HARRELL,
Defendants Below, Petitioners

v.

GWENDOLYN CAIN, Executrix of the Estate of
Arthur E. Lewis, deceased;
PAUL ALFORD, individually; and
AMBRIA ALFORD, an infant by
and through her guardian, Gwendolyn Cain,
Plaintiffs Below, Respondents

_____

Appeal from the Circuit Court of Hancock County
The Honorable Jason A. Cuomo, Judge
Civil Action No. 10-C-100

AFFIRMED
_____

Submitted: April 23, 2019
Filed: June 5, 2019

William J. Leon, Esq.
William J. Leon, LC
Morgantown, West Virginia
Counsel for the Petitioners

Thomas J. Decapio, Esq.
Kevin M. Pearl, Esq.
Frankovitch, Anetakis, Simon,
Decapio & Pearl, LLP
Weirton, West Virginia
Counsel for the Respondents

JUSTICE HUTCHISON delivered the Opinion of the Court.

JUSTICE WORKMAN dissents and reserves the right to file a separate opinion.

# SYLLABUS BY THE COURT

1.     "Deeds are subject to the principles of interpretation and construction that govern contracts generally."  Syl. Pt. 3, *Faith United Methodist Church & Cemetery of Terra Alta v. Morgan*, 231 W.Va. 423, 745 S.E.2d 461 (2013).

2.     "In reviewing challenges to the findings and conclusions of the circuit court made after a bench trial, a two-pronged deferential standard of review is applied.  The final order and the ultimate disposition are reviewed under an abuse of discretion standard, and the circuit court's underlying factual findings are reviewed under a clearly erroneous standard.  Questions of law are subject to a *de novo* review."  Syl. Pt. 1*, Pub. Citizen, Inc. v. First Nat'l Bank in Fairmont*, 198 W.Va. 329, 480 S.E.2d 538 (1996).

3.     The determination of whether a deed, contract, or other writing is ambiguous and does not clearly express the intention of the parties is a question of law to be determined by the court.

4.     If a circuit court finds that a deed, contract, or other writing is ambiguous and does not clearly express the intention of the parties, then the proper interpretation of that ambiguous document, when the facts are in dispute, presents a question of fact for the factfinder to resolve after considering all relevant extrinsic evidence.

5. "For ascertainment of the intent of the parties to a deed in which the description of the subject matter is inconsistent, contradictory and ambiguous, extrinsic evidence is admissible." Syl. Pt. 1, *State v. Herold*, 76 W.Va. 537, 85 S.E. 733 (1915).

6. "To enable the court to construe a deed or other writing, ambiguous on its face, it is always permissible to prove the situation of the parties, the circumstances surrounding them when the contract was entered into and their subsequent conduct giving it a practical construction, but not their verbal declarations. But, if a latent ambiguity is disclosed by such evidence, such for instance as that the terms of the writing are equally applicable to two or more objects, when only a certain one of them was meant, then prior and contemporaneous transactions and collocutions of the parties are admissible, for the purpose of identifying the particular object intended." Syllabus Point 2, *Snider v. Robinett*, 78 W.Va. 88, 88 S.E. 599 (1916).

7. "Where there is ambiguity in a deed, or where it admits of two constructions, that one will be adopted which is most favorable to the grantee." Syllabus Point 6, *Paxton v. Benedum-Trees Oil Co.*, 80 W.Va. 187, 94 S.E. 472 (1917).

**HUTCHISON, Justice**:

In this appeal from the Circuit Court of Hancock County, we review the circuit court's January 26, 2018, declaratory judgment order issued after a bench trial. The circuit court's order interpreted a 1977 quitclaim deed whereby the grantor gave the grantee a parcel of land. However, the grantor imprecisely defined the parcel's southern border in the deed, leaving two questions: whether the grantee received a 93.15-acre parcel or only a 33-acre parcel; and if the grantee received only a 33-acre parcel, then who owned the remaining 60.15 acres. The parties are successors of the grantor and grantee.

After finding the 1977 deed was ambiguous, the trial court conducted a bench trial. Substantial evidence was produced that, in the decades after 1977, the grantor, the grantee, their spouses, their families and their heirs conducted themselves as though the grantee owned the entire 93.15-acre parcel. Accordingly, the circuit court entered judgment for the grantee's successors. The grantor's successors now appeal.

As we discuss below, we find no error in the circuit court's findings and affirm the circuit court's declaratory judgment order.

### I. Factual and Procedural Background

Raymond Lewis and Arthur Lewis were brothers. In 1966, Raymond and Arthur (and their respective spouses[1]) purchased a roughly 185-acre parcel in Hancock

---

[1] Raymond was married to Jean Lewis; Arthur was married to Beverly Lewis.

County.  An east-west road crossed the parcel, the "old Lawrenceville Road" (now designated as West Virginia State Route 16/2).  Raymond and Arthur owned the parcel as tenants in common, and over the years conveyed around 48 of the 185 acres in their parcel to others.

Eleven years later, Arthur informed Raymond that he wished to build a house on the parcel.  In response, Raymond and Arthur (and their spouses) exchanged quitclaim deeds with one another to divide their remaining 137 acres.  On November 29, 1977, Arthur delivered a quitclaim deed conveying to Raymond all the land *north* of the old Lawrenceville Road.  Raymond's tract was defined entirely by metes and bounds. However, the parties now agree that Raymond's tract consisted of about 40 acres, leaving about 93.15 acres[2] in the names of both brothers.  The parties do not dispute Raymond's tract.

---

[2] The parties' math is somewhat ambiguous regarding the acreage, in part because neither Raymond nor Arthur described their parcels in terms of acreage.  Raymond and Arthur bought approximately 185 acres in 1966, and out-conveyed 48 acres by 1977, leaving 137 acres jointly owned by the brothers.  The parties agree that Raymond received about 40 acres from Arthur, leaving 97 acres remaining south of the old Lawrenceville Road.

However, in their briefs, the parties consistently refer to the land south of the road as comprised of 93.15 acres, leaving 4 acres unaccounted for in the math.  We believe the parties' arguments implicitly account for Arthur's 2005 conveyance of 4.446 acres of land south of the old Lawrenceville Road to First Energy Corporation, a transaction we discuss later.  Accordingly, throughout this opinion, we refer to the lands south of the road as a 93.15-acre parcel.

This case centers on the November 29, 1977, quitclaim deed that Raymond gave to Arthur (the "Arthur Deed"). The quitclaim deed conveyed a parcel *south* of the old Lawrenceville Road. The Arthur Deed adequately describes the western, northern, and eastern boundaries of the parcel with metes and bounds. Problematically, it does not describe the southern boundary with sufficient specificity to determine whether Raymond intended to convey to Arthur all, or only part, of the parties' acreage south of the old Lawrenceville Road. Arthur's successors contend Raymond conveyed to Arthur all 93.15 acres south of the old Lawrenceville Road; Raymond's successors contend that only about 33 acres of the land was conveyed, and that they own the remaining 60 acres as tenants in common with Arthur's successors.

The parties' arguments focus on the southern boundary of Arthur's parcel. Although the property had an inverted "V"-shaped southern border, the Arthur Deed describes the southern boundary with a straight line. Moreover, the deed description fails to delineate where the southern boundary line begins or ends. Specifically, the deed description contains a call which reads: "beginning at a point on the Pennsylvania State Line, then North 68°, 54' -11" West to the centerline of the dirt road[.]"[3] There is nothing

<hr />

[3] The Arthur Deed contains the following property description (with emphasis added):

> A certain tract in Grant District, Hancock County, West Virginia, *beginning at a point on the Pennsylvania State Line, then North 68° -54' -11" West to the center line of a dirt road*, then along said center line North 31° -52' -06" East to a point on said center line, then along said center line North 31° -03' -

3

in the deed to suggest where this starting "point" on the state line was located. This boundary line had not been in any prior deed.

The circuit court found at the bench trial that, after Raymond and Arthur divided their lands in 1977, the brothers and their families acted as though Arthur was the sole owner of all of the land south of the old Lawrenceville Road (now a 93.15-acre parcel). It was not until 2005, when First Energy Corporation ("First Energy") approached Arthur seeking to buy a 4.446-acre lot, that Arthur and his family, as well as Raymond's family, first learned of the flawed border description in the Arthur Deed. First Energy revealed that, in its title search, it found that the southern border of Arthur's parcel did not close.[4]

---

56" East to the center line of a paved road known as West Virginia Route 1612, then South 61° -26' -44" East along second said center line, then North 77° -43' -36" East to a point on the Pennsylvania State line, then South 01° -46' -36" West along the Pennsylvania Line to the place of beginning.

Being a part of the property conveyed by Clark and Alice Stewart to Arthur, Beverly, Raymond, and Jean Lewis by deed of June 23, 1966, recorded in Deed Book 129 of the records of the Clerk of Hancock County, West Virginia.

[4] Arthur (acting through a power of attorney given to his daughter, plaintiff Gwendolyn Cain) gave First Energy a deed to the lot that the company needed. Additionally, First Energy determined that both Raymond and Raymond's wife had died in the 1990s. Hence, it sought and received a quitclaim deed to the same lot from Raymond's heirs (his son and daughter-in-law, Thomas and Vicki Lewis).

The plaintiffs in this case are Arthur's descendants in title. Arthur Lewis died testate in 2006 still owning his parcel south of the old Lawrenceville Road.[5] By his will, Arthur left the parcel to his grandsons, Dexter Alford and plaintiff Paul Alford. When Dexter died in 2008, plaintiff Ambria Alford (then a minor) inherited Dexter's one-half share of the parcel via intestate succession. Plaintiff Gwendolyn Cain was Arthur's daughter, executor of Arthur's estate, and the guardian of Ambria Alford.

The defendants are Raymond's descendants in title. Raymond died in 1994, and his wife died in 1996. Their son and daughter-in-law, Thomas and Vicki Lewis,[6] inherited ownership of Raymond's 40-acre parcel. However, in June 2008, Thomas and Vicki Lewis gave a quitclaim deed to the defendants and petitioners in this appeal, James and Betsy Harrell. The description in the quitclaim deed to the Harrells is not limited to the 40-acre parcel, but rather purports to convey all of Raymond's interest in the 185-acre tract (less several conveyances) that he owned as tenant in common with Arthur between 1966 and 1977.

The plaintiffs contend that the 1977 Arthur Deed conveyed to Arthur all of the remaining acreage owned by the brothers south of the old Lawrenceville Road, a parcel the parties say is 93.15 acres in size. However, once the defendants received their quitclaim

---

[5] Arthur's wife, Beverly Lewis, died in 1981. By will, she had bequeathed her interest in the parcel to Arthur.

[6] Thomas and Vicki Lewis were defendants in the action below. They are not participating in this appeal.

5

deed from Raymond's heirs in 2008, disputes began between the defendants and the plaintiffs. The defendants claimed the Arthur Deed only conveyed a parcel south of the old Lawrenceville Road about 33 acres in size. Therefore, the defendants asserted their right to enter the remaining 60 acres south of that parcel, as tenants in common with the plaintiffs.

The plaintiffs filed the instant case against the defendants for a declaratory judgment to quiet title in 2010. The plaintiffs asked for a judgment declaring that the defendants owned no interest in the 93.15-acre parcel south of the old Lawrenceville Road, and declaring that plaintiffs Paul Alford and Ambria Alford owned the parcel in equal undivided one-half shares.

In April 2017, the parties filed cross-motions for summary judgment. The plaintiffs argued that the 1977 Arthur Deed was ambiguous, but that Raymond and Arthur's conduct after 1977 established that Raymond and Arthur believed and acted as though Arthur owned all of the 93.15 acres south of the old Lawrenceville Road. The defendants argued that while the Arthur Deed "appears to be ambiguous," Raymond's and Arthur's constructive knowledge of property boundaries revealed by a title examination back to the 1850s removes that ambiguity and shows Raymond intended to convey to Arthur only about 33 acres.

In an order dated May 2, 2017, the circuit court granted partial summary judgment to the plaintiffs. The court examined the language of the 1977 Arthur Deed and

6

found that "the metes and bounds within the description [of Arthur's parcel] are inaccurate and fail[] to close the southern border of the property purported to be conveyed." Because of this, the circuit court could not determine whether the intent of Raymond was to convey to Arthur a mere 33 acres, or the entire 93.15 acres, south of the old Lawrenceville Road. The circuit court therefore declared that the Arthur Deed was ambiguous, and granted judgment to the plaintiffs on this legal question alone.

The circuit court then cited the common-law rule that "[d]eeds are subject to the principles of interpretation and construction that govern contracts generally." Syl. Pt. 3, *Faith United Methodist Church & Cemetery of Terra Alta v. Morgan*, 231 W.Va. 423, 745 S.E.2d 461 (2013). To construe an inconsistent or ambiguous writing, the court recognized that it needed to weigh extrinsic evidence of the intent of the parties to the writing. To do this, the circuit court understood it needed to evaluate the evidence regarding Raymond and Arthur's conduct before and after their exchange of quitclaim deeds in 1977.

On August 8, 2017, the circuit court conducted a bench trial and allowed the plaintiffs and defendants to present evidence regarding Raymond and Arthur's intent behind the ambiguous 1977 Arthur Deed. The plaintiffs' evidence was that, during their lifetimes and after 1977, Arthur and Raymond agreed and acted as though Arthur owned the entire 93.15-acre parcel south of the old Lawrenceville Road. As Arthur's daughter testified, Raymond "took the nice 40 acres, the nice level ground" north of the old Lawrenceville Road while her "dad took the other side [of the road], the hills." Arthur

7

made numerous improvements to the 93.15-acre parcel, all at his own expense. For instance, Arthur built a house that he and his wife lived in. He also built a lake that he then stocked with fish, cut and maintained trails with a bulldozer, and allowed his grandsons and their friends to build a cabin on the disputed portion of the 93.15-acre parcel. He also built fences. Conversely, Raymond made no improvements to the acreage south of the old Lawrenceville Road.

Several other witnesses testified that Arthur used the 93.15-acre parcel as his own, and that he brush-hogged the land; ran rabbit dogs, hunted deer and turkey, fished and camped on the land; and grew gardens. One witness testified that, in 1988, Arthur gave him a handwritten permission slip to hunt on the entire 93.15-acre parcel, and that in the 1990s he frequently hunted on the parcel. The witness said that on one occasion, he met Arthur and Raymond on the road separating their properties. Arthur explained to the witness that he was allowed to hunt on the southern side of the old Lawrenceville Road; Raymond said he was raising pheasants on his property, so he did not want anyone hunting on his parcel on the northern side of the Road.

The plaintiffs' evidence also showed that Arthur had the 93.15-acre parcel logged three times, in the 1980s, 1990s, and in the early 2000s. Arthur kept all of the money paid for the timber. Similarly, Raymond had his 40-acre parcel logged; Raymond kept all of the money from the sale of that timber for himself.

8

Plaintiff Paul Alford testified that his grandfather, Arthur Lewis, had walked with him and shown him the boundaries of his land as encompassing the entire 93.15 acres. Plaintiff Gwendolyn Cain (Paul's mother and Arthur's daughter) described how, in 1990, Arthur tried to persuade her to build a house, barn and cattle farm on the portion of the 93.15-acre parcel that the defendants claim they now own in common with the plaintiffs. Mrs. Cain declined to build on the land, but went on to describe how Raymond and Arthur had conveyed to her a half-acre tract in the early 1970s that adjoined what is now the disputed portion of Arthur's parcel. Mrs. Cain also testified that she was the executor of Arthur's estate after he died in 2006. She described that Arthur's will (executed in 2000) bequeathed to her son Dexter, as the sole owner, a six-acre tract that surrounded her half-acre tract. This six-acre tract is located entirely within the disputed area claimed by the defendants.

The plaintiffs also offered the circuit court evidence regarding the real estate taxes paid on the land. The evidence showed that, after 1977, Arthur paid all of the taxes on the entire 93.15-acre parcel.[7] After Arthur's death, plaintiff Paul Alford paid the taxes on the entire 93.15-acre parcel.

---

[7] Vicki Lewis testified that a sludge pond was located on Raymond's 40-acre parcel. Vicki understood from conversations with Raymond and his wife that, after 1977, Arthur signed a contract to allow sludge dumping on Raymond's parcel. Arthur received all of the money from the dumping, money that he used to pay real estate taxes. However, Mrs. Lewis also testified that all of Raymond's "tax papers" – including for taxes on Raymond's personal house in Weirton and his car – went to Arthur, who proceeded to pay those taxes.

9

Lastly, the plaintiffs relied on documents from the estates of Raymond Lewis and his wife, Jean Lewis. When Raymond died in 1993, an appraisal of his estate signed under oath by Jean did not identify Raymond having any ownership interest in Arthur's 93.15-acre parcel. Instead, the appraisal showed ownership only of the 40-acre tract north of the old Lawrenceville Road. Similarly, when Jean died in 1996, an appraisal of her estate signed under oath by her son, Thomas Lewis, did not identify Jean as having an interest in the 93.15-acre parcel. The plaintiffs also offered testimony that, until the genesis of this lawsuit around 2010, neither Thomas Lewis nor his wife Vicki (as heirs of Raymond and Jean Lewis) asserted any ownership interest in the parcel.

The defendants' evidence centered on a complex theory that, while the Arthur Deed may be vague in its description of the southern border, that imprecision was clarified by examining the Arthur Deed in light of over a century of title history.

The defendants averred that the southern boundary line imprecisely described in the Arthur Deed seems to be rooted in a 1973 survey of the northern portion of Arthur and Raymond's original tract. It appears a company wanted to buy several small lots from Raymond and Arthur on which it intended to construct industrial ponds. An engineering firm conducted a survey (which the parties call the "Baker survey") of only the northern part of the 185-acre tract; the survey was not designed to describe Raymond and Arthur's land, but rather to identify sites suitable for the company to purchase. The Baker survey, in part, identified the boundaries of a 121-acre parcel that formerly existed within the brothers' 185-acre tract. The 1860 deed for that 121-acre parcel described a

10

border running, essentially, "North 71° West 172.2 poles."[8] The defendants contend that the third revision of the Baker survey established the southern boundary of that 121-acre parcel just over two degrees different, running "North 68° -54' -11" West" – the same call contained in the Arthur Deed (but, unlike the survey, having no specific starting point, ending point, or specified length).

The centerpiece of the defendants' case was expert testimony from a real estate lawyer and a surveyor. This expert testimony revolved around the legal notion that Raymond and Arthur were presumed to have knowledge of all of the facts set forth in prior deeds recorded in their chain of title, dating back to the 1850s. In summary, the various deeds show that the 185-acre tract purchased by Raymond and Arthur in 1966 had been assembled by a prior owner in the 1890s from three smaller tracts 4-, 60-, and 121-acres in size. The real estate lawyer testified that the 121-acre tract had a southern border with a similar description, and similar location, to the description contained in a plat attached to the Baker survey[9] and to the southern border in Arthur's deed. The lawyer concluded that

---

[8] The September 21, 1860, deed in question subdivided a 208-acre parcel, and the southern boundary had a call "South 71° East 172.2 poles," a pole being a line 16.5 feet in length. For clarity, the defendants' experts merely reversed the bearing of this line to "North 71° West 172.2 poles."

[9] The defendant's real estate lawyer expert opined that Raymond and Arthur were expected, as a matter of law, to know the details of the plat that resulted from the third revision of the Baker survey, even though that plat was never recorded. The circuit court expressed dismay at the impracticality of this opinion:

Raymond and Arthur's use of language similar to the 1860 deed and the 1973 Baker survey indicates that the brothers must have intended to want a southern boundary identical to the southern boundary of the ancient 121-acre tract. The surveyor also opined that the southern boundary of Arthur's parcel should be located at the southern boundary of the ancient 121-acre tract. Taken together, these experts were of the opinion that Raymond only intended to convey about 33 acres to Arthur, and that he intended to share ownership of the remaining 60 some acres with Arthur.

---

Expert Witness: . . . The plat shows a line running from the Pennsylvania State Line to a dirt road with that bearing. . . .

The Court: . . . And that [plat] comes from where[?]

Expert Witness: Well, that's a good question. This actual copy was given to me by the defendant. . . .

The Court: Is that recorded somewhere?

Expert Witness: It is not, but it is incorporated by reference, giving everybody constructive notice of its existence. . . .

The Court: Putting them on notice of what, it's not recorded?

Expert Witness: Of what's shown on the plat.

The Court: How are you going to find the plat if it's not recorded?

Expert Witness: You're on notice inquiry, Your Honor. You have to go find the plat. . . . That's the problem with referencing plats and not recording them.

The Court: So you're saying that this deed from '77 is unambiguous, requires all of this, plus constructive notice of a plat that's not even recorded?

12

The defendants also relied on testimony by Raymond's son Thomas Lewis, as well as testimony by Thomas's wife Vicki Lewis. Thomas and Vicki testified that both Raymond and Jean Lewis mentioned owning some share of the 93.15-acre parcel. However, neither Thomas nor Vicki could say where or how much acreage Raymond and/or Jean owned south of the old Lawrenceville Road. On cross-examination, Thomas and Vicki admitted that they gave permission for people to hunt on the 40-acre parcel north of the old Lawrenceville Road; they never gave permission to anyone to hunt on lands south of the road.

In an order dated January 26, 2018, the circuit court granted judgment in favor of the plaintiffs. The circuit court declared that Raymond and Arthur intended for the 1977 Arthur Deed to convey to Arthur all of the brothers' land south of the old Lawrenceville Road. In a detailed order, the circuit court found that Raymond and Arthur "cobbled together a legal description" of Arthur's parcel using measurements from the Baker survey. The brothers did this despite the fact that the survey "did not describe and define all of the remaining lands owned by the Lewis brothers in 1977." As the court had found in its previous order, this language created an ambiguity regarding the amount of land Raymond intended to convey to Arthur.

However, the circuit court found that Raymond and Arthur's actions after delivery of the Arthur Deed showed that the brothers intended for Arthur to own all of the land south of the old Lawrenceville Road. The circuit court determined that Arthur exercised sole possession of the 93.15-acre parcel when he resided on the land, built

13

structures on the land, and permitted some individuals on the land, but barred others. Arthur used the entire parcel as his own, brush hogging the land, running rabbit dogs, hunting deer and turkey, building a lake and stocking the lake with fish, and gardening on the land. The court found neighbors and the community believed that Arthur owned the entire parcel. At Arthur's death in 2006, his will bequeathed parcels of the 93.15 acres as though Arthur believed he owned the entire parcel outright.

Moreover, at no time did Raymond, his wife Jean, or their heirs and beneficiaries directly assert, to Arthur or his heirs and beneficiaries, an ownership interest in the 93.15-acre parcel. When Raymond died in 1993, his wife Jean Lewis filed a property appraisement form of Raymond's estate where she stated Raymond only owned an interest in the 40-acre parcel north of the old Lawrenceville Road. The circuit court found that Jean's appraisement of Raymond's estate was a "sworn statement under oath as to her knowledge of all the real estate owned by Raymond S. Lewis at the time of his death." Raymond's wife did not identify any ownership interest in Arthur's 93.15-acre parcel. The circuit court saw this as "the most recent and direct evidence" of the intent of the parties.

The circuit court therefore declared that the intent of the parties to the 1977 Arthur Deed "was to convey the entire remaining interest in the lands owned originally as tenants in common" exclusively to Arthur.[10]

_____

[10] In their complaint, as an alternative, the plaintiffs asked for a declaration that Arthur had taken sole ownership of the parcel by adverse possession. The circuit

14

The defendants now appeal the circuit court's January 26, 2018, judgment order declaring that Raymond, by the Arthur Deed, intended to convey to Arthur the entire 93.15-acre parcel south of the old Lawrenceville Road.

## II. Standard of Review

The defendants ask this Court to review the circuit court's findings of fact and conclusions of law made after holding a bench trial. We stated our deferential standard of review in Syllabus Point 1 of *Public Citizen, Inc. v. First National Bank in Fairmont*, 198 W.Va. 329, 480 S.E.2d 538 (1996):

> In reviewing challenges to the findings and conclusions of the circuit court made after a bench trial, a two-pronged deferential standard of review is applied. The final order and the ultimate disposition are reviewed under an abuse of discretion standard, and the circuit court's underlying factual findings are reviewed under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

Justice Cleckley once eloquently outlined the "dead-fish" deference an appellate court affords to a trial judge's factual findings based upon a bench trial:

> Following a bench trial, the circuit court's findings, based on oral or documentary evidence, shall not be overturned unless clearly erroneous, and due regard shall be given to the

court's order found that the plaintiffs had proven adverse possession. On appeal, the defendants contend the circuit court erred in finding Arthur adversely possessed the full parcel against his cotenant Raymond. *See* Syl. Pt. 3, *Somon v. Murphy Fabrication & Erection Co.*, 160 W.Va. 84, 232 S.E.2d 524 (1977) (outlining elements of adverse possession). Our law is clear that "mere silent possession" of land by one cotenant is insufficient to establish an adverse possession claim against another cotenant. Instead, there must be evidence that one cotenant openly sought to oust the other cotenant, and that ouster was known by the other cotenant. *See* Syl. Pt. 10, *Jarrett v. Osborne*, 84 W.Va. 559, 101 S.E. 162 (1919). Our opinion centers on the circuit court's interpretation of the parties' intent behind the Arthur Deed, and we do not address this part of the circuit court's order.

15

opportunity of the circuit judge to evaluate the credibility of the witnesses. W.Va.R.Civ.P 52(a). Under this standard, if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety, we may not reverse it, even though convinced that had we been sitting as the trier of fact, we would have weighed the evidence differently. We will disturb only those factual findings that strike us wrong with the "force of a five-week-old, unrefrigerated dead fish." *United States v. Markling,* 7 F.3d 1309, 1319 (7th Cir. 1993), *cert. denied,* 514 U.S. 1010, 115 S.Ct. 1327, 131 L.Ed.2d 206 (1995).

*Brown v. Gobble*, 196 W.Va. 559, 563, 474 S.E.2d 489, 493 (1996). *See also*, *Phillips v. Fox*, 193 W.Va. 657, 661, 458 S.E.2d 327, 331 (1995) ("[A] reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." (Cleaned up))

## III. Discussion

The defendants contend that the circuit court erred in its conclusion that the parties intended to convey Arthur the entire 93.15-acre parcel south of the old Lawrenceville Road. The defendants believe the circuit court ignored evidence regarding Raymond's and Arthur's intentions behind the 1977 Arthur Deed. In their brief, the defendants again present their complex argument that the Arthur Deed's use of the "North 68° -54' -11" West" call was an expression that the parties intended to mimic the boundary line drawn in the Baker survey containing this call, which can be inferred through a search of titles dating back to the 1850s. They maintain that Raymond and Arthur merely meant

16

to convey 33 acres to Arthur, and intended to continue jointly owning the 60 acres on the southern portion of their 1966 parcel.

The plaintiffs' position is that Raymond and Arthur intended to divide their 1966 parcel along the old Lawrenceville Road, with Raymond taking the 40 acres north of the road, and Arthur taking "everything else" south of the road. The plaintiffs note that the defendants base their argument entirely on documents of record of which Raymond and Arthur are deemed to have *constructive* notice. The plaintiffs argue that the defendants' theoretical argument is completely inconsistent with Raymond and Arthur's conduct. The plaintiffs point to the evidence and testimony presented showing that, after Raymond delivered the Arthur Deed in 1977, Raymond, Arthur, their spouses, their families, and the community acted as though Arthur owned the entire 93.15-acre southern parcel.

"[T]he polar star that should guide us in the construction of deeds as of all other contracts is, what was the intention of the party or parties making the instrument, and when this is determined, to give effect thereto, unless to do so would violate some rule of property." *Totten v. Pocahontas Coal & Coke Co*., 67 W.Va. 639, 642, 68 S.E. 373, 374 (1910). The determination of whether a deed, contract, or other writing is ambiguous and does not clearly express the intention of the parties is a question of law to be determined by the court. *See Gastar Expl. Inc. v. Rine*, 239 W.Va. 792, 799, 806 S.E.2d 448, 455 (2017) ("Whether a deed is ambiguous is a question of law to be determined by the court."); Syllabus Point 1, in part, *Berkeley Cty. Pub. Serv. Dist. v. Vitro Corp. of Am.*, 152 W.Va.

17

252, 162 S.E.2d 189 (1968) ("The question as to whether a contract is ambiguous is a question of law to be determined by the court.").

In this case, the circuit court found, as a matter of law, that the Arthur Deed was ambiguous because it does not establish, with certainty or clarity, Raymond's intentions regarding the southern boundary of the conveyance to Arthur. The record supports this finding of ambiguity, and the parties do not seriously dispute it.[11]

Whether a writing is ambiguous is a question of law. But if a circuit court finds that a deed, contract, or other writing is ambiguous and does not clearly express the intention of the parties, then the proper interpretation of that ambiguous document, when the facts are in dispute, presents a question of fact for the factfinder to resolve after considering all relevant extrinsic evidence. *See Payne v. Weston*, 195 W.Va. 502, 507, 466 S.E.2d 161, 166 (1995) ("It is only when the document has been found to be ambiguous that the determination of intent through extrinsic evidence become[s] a question of fact."); *Coleman v. Sopher*, 201 W.Va. 588, 599 n.15, 499 S.E.2d 592, 603 n.15 (1997) ("Determination of the intent of parties to a contract typically creates a question of fact to

_____

[11] The defendants' argument is, on the one hand, that even though there is no clearly defined starting or ending point for the southern boundary, the Arthur Deed is unambiguous. On the other hand, the defendants suggest that all deeds are, in some fashion, ambiguous – and to the extent that the southern boundary is ambiguous, that ambiguity is removed by reviewing extrinsic evidence.

18

be determined by a jury.").[12]  As this Court said in Syllabus Point 4, *Watson v. Buckhannon River Coal Co.,* 95 W.Va. 164, 120 S.E. 390 (1923):

> While the general rule is that the construction of a writing is for the court; yet where the meaning is uncertain and ambiguous, parol evidence is admissible to show the situation of the parties, the surrounding circumstances when the writing was made, and the practical construction given to the contract by the parties themselves either contemporaneously or subsequently.  If the parol evidence be not in conflict, the court must construe the writing; but if it be conflicting on a material point necessary to interpretation of the writing, then the question of its meaning should be left to the jury under proper hypothetical instructions.

---

[12] *See also Hurt-Hoover Investments, LLC v. Fulmer*, 448 S.W.3d 696, 703 (Ark. 2014) ("The initial determination of the existence of ambiguity rests with the court and, if the writing contains a term which is ambiguous, parol evidence is admissible and the meaning of the ambiguous term becomes a question of fact for the fact-finder."); *Konneker v. Romano*, 785 N.W.2d 432, 440 (Wis. 2010) ("The construction of an unambiguous deed is . . . a question of law.  However, if the language of the deed is ambiguous, then the intent behind the language presents a question of fact."); *Deltic Timber Corp. v. Newland*, 374 S.W.3d 261, 266 (Ark. App. 2010) ("When a deed is ambiguous, the court must put itself as nearly as possible in the position of the parties to the deed, particularly the grantor, and interpret the language in the light of attendant circumstances."); *Olde Severna Park Improvement Ass'n, Inc. v. Barry*, 982 A.2d 905, 922 (Md. App. 2009) ("The intention of the grantor is a question of fact, and 'the surrounding circumstances . . . must be analyzed in order to truly understand an unexpressed intention.'" (Citation omitted)); *C & G, Inc. v. Rule*, 765, 25 P.3d 76, 78 (Idaho 2001) ("Interpretation of an ambiguous document presents a question of fact, and we will defer to the findings of the trial court so long as those findings are supported by substantial and competent evidence."); *Kipp v. Estate of Chips*, 732 A.2d 127, 131 (Vt. 1999) ("If the court then finds the writing is ambiguous, the proper interpretation becomes a question of fact, to be determined on all relevant evidence."); *Norken Corp. v. McGahan*, 823 P.2d 622, 626 (Alaska 1991) ("Conclusions about the parties' intent drawn by the trial court after sifting and weighing such extrinsic evidence are conclusions of fact.  This court will not disturb those findings on review unless they are clearly erroneous – that is, unless a review of the entire record engenders a firm and definite conviction that a mistake has been made." (Cleaned up)).  *See generally*, 26A C.J.S. Deeds § 177 (2019) ("[I]f the language of a deed is ambiguous, then the intent behind the language presents a question of fact.")

19

"[W]hen a deed is inconsistent, confusing or ambiguous on its face, a court must look to extrinsic evidence of the parties' intent to construe the deed." *Gastar*, 239 W.Va. at 799, 806 S.E.2d at 455. As we said in *Fraternal Order of Police, Lodge No. 69 v. City of Fairmont*, 196 W.Va. 97, 101 n.7, 468 S.E.2d 712, 716 n.7 (1996):

> If an inquiring court concludes that an ambiguity exists in a contract, the ultimate resolution of it typically will turn on the parties' intent. Exploring the intent of the contracting parties often, but not always, involves marshaling facts extrinsic to the language of the contract document. When this need arises, these facts together with reasonable inferences extractable therefrom are superimposed on the ambiguous words to reveal the parties' discerned intent.

"A trial court may look to a variety of evidence, including the parties' conduct *before and after* delivery of the deed, to discern the parties' intent[.]" *Gastar*, 239 W.Va. at 799, 806 S.E.2d at 455. *See also*, *Phillips*, 193 W.Va. at 662, 458 S.E.2d at 332 ("As a general principle, ambiguities in a deed are to be clarified by resort to the intention of the parties ascertained from the deed itself, the circumstances surrounding its execution, as well as the subject matter and the parties' situation at that time."); Syllabus Point 1, *State v. Herold*, 76 W.Va. 537, 85 S.E. 733 (1915) ("For ascertainment of the intent of the parties to a deed in which the description of the subject matter is inconsistent, contradictory and ambiguous, extrinsic evidence is admissible.").

In Syllabus Point 2 of *Snider v. Robinett*, 78 W.Va. 88, 88 S.E. 599 (1916), this Court outlined the types of extrinsic evidence that a court may use to discern the intent of the parties to a deed:

20

To enable the court to construe a deed or other writing, ambiguous on its face, it is always permissible to prove the situation of the parties, the circumstances surrounding them when the contract was entered into and their subsequent conduct giving it a practical construction, but not their verbal declarations. But, if a latent ambiguity is disclosed by such evidence, such for instance as that the terms of the writing are equally applicable to two or more objects, when only a certain one of them was meant, then prior and contemporaneous transactions and collocutions of the parties are admissible, for the purpose of identifying the particular object intended.

*See also* Syl. Pt. 10, *Paxton v. Benedum-Trees Oil Co.,* 80 W.Va. 187, 94 S.E. 472 (1917) ("Proper parol evidence is admissible to explain a latent ambiguity in a written contract, and a latent ambiguity is one which arises not upon the words of the instrument, as looked at in themselves, but upon those words when applied to the object sought to be accomplished by the contract or the subject which they describe."); Syl. Pts. 2 and 3, *Bank v. Catzen,* 63 W.Va. 535, 60 S.E. 499 (1908) ("When, in attempting to apply a deed to its subject matter or the parties thereto, a latent ambiguity of any kind is disclosed, parol evidence is admissible to a limited extent, to show what was intended, not only by the instrument considered as a whole, but also by particular words or clauses thereof." And, "Parol evidence, admissible for such purpose, is generally limited to the subject-matter, the relation of the parties thereto, their prior and subsequent conduct, their situation, and all the facts and circumstances existing at the time of the execution of the instrument.").

"To divine the intent of the parties to an ambiguous deed, and to give the deed a practical construction, a court may consider the circumstances surrounding the parties *when the deed was negotiated* and delivered, and may consider *their subsequent*

21

*conduct*." *Gastar*, 239 W.Va. at 801, 806 S.E.2d at 457 (emphasis added). In this case, the defendants' experts offered opinions about Raymond's and Arthur's constructive knowledge, at the time the 1977 Arthur Deed was negotiated, of the various deeds in their chain of title dating back to the 1850s, and of the 1973 Baker survey that, in part, relied upon those deeds. The defendants contend the trial court should have focused solely upon their expert witness testimony that, they repeatedly note, was unrebutted by the plaintiffs. Based on a legal review of the deeds and the survey, those experts were of the opinion that Raymond and Arthur must have intended to reserve about 60 acres south of Arthur's 33-acre parcel as property owned in common.

At trial, the circuit court described the defendants and their experts as "hav[ing] to go through these gyrations" to prove their case. The circuit court's order contains thorough summaries of the defendants' expert testimony as part of its overall analysis of the "situation of the parties, the circumstances surrounding them when the contract was entered into and their subsequent conduct[.]" *See* Syl. Pt. 2, *Snider*. The circuit court did not ignore the defendants' expert testimony but, rather, was not persuaded by that testimony.

Instead, the circuit court found the plaintiffs' extrinsic evidence to be more compelling. That evidence focused on Raymond and Arthur's conduct subsequent to the delivery of the Arthur Deed, which showed that, after 1977, Raymond, Arthur, their spouses, and their families acted as though Arthur and his wife owned the entire 93.15-acre parcel as their own. Arthur lived on the land, built on the land, paid taxes and upkeep for

22

the land, and invited some people onto the land and excluded others. During his lifetime, Raymond never challenged Arthur's assertion of ownership; when Raymond died in 1993 and his wife filed estate papers identifying Raymond's property, she never asserted that Raymond had an ownership interest in any part of the 93.15-acre parcel.

Moreover, the circuit court was driven to find in favor of Arthur's successors by an axiom of contract law: an ambiguous document is always construed against the drafter. As we said in Syllabus Point 6 of *Paxton*, 80 W.Va. at 187, 94 S.E. at 472: "Where there is ambiguity in a deed, or where it admits of two constructions, that one will be adopted which is most favorable to the grantee." Applying this principle to the ambiguous Arthur Deed, the circuit court found that Raymond intended to convey the entire remaining interest in the lands owned originally by the brothers as tenants in common exclusively to Arthur.

Our guiding standard is that a circuit court's findings in a bench trial, based on oral or documentary evidence, cannot be overturned unless clearly erroneous. *See* R.Civ.Pro. Rule 52(a). This Court gives due regard to a circuit judge's ability to evaluate the credibility of the witnesses. Under this standard, "if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety, we may not reverse it, even though convinced that had we been sitting as the trier of fact, we would have weighed the evidence differently." *Brown*, 196 W.Va. at 563, 474 S.E.2d at 493.

The circuit court's order fully describes and weighs the evidence presented at the bench trial. After a careful review of the evidence, the circuit court rejected the defendants' interpretation of the deed and accepted the plaintiffs' interpretation. We cannot say, on this record, that the circuit court's decision was clearly erroneous. Accordingly, because the circuit court's decision is well supported by the record, we affirm.

## IV. Conclusion

The circuit court's January 26, 2018, judgment order is affirmed.

Affirmed.